159 F.3d 453
 98 Cal. Daily Op. Serv. 8049, 98 Daily Journal
D.A.R. 11,185
Theodore Chester KULAS, Plaintiff-Appellant,
v.
CSO VALDEZ; Officer Kotzin, Psychiatric Ward, Madison
Street Jail; Officer Fay; Officer Lambert; Maricopa
County Sheriff's Office, Sgt. Medina, Corrections Officer,
Psychiatric Ward at Madison Street Jail; Sgt. Ceselini;
Potts; Hoffert; Osran, Defendants-Appellees.
 No. 96-17198.
 United States Court of Appeals,
Ninth Circuit.
 Submitted April 16, 1998.*
Decided Oct. 29, 1998.
 
 Theodore C. Kulas, Douglas, AZ, In Pro Per, for the plaintiff-appellant.
 Mary C. Cronin, Deputy County Attorney, Maricopa County Attorney's Office, Phoenix, AZ, for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona; Robert C. Broomfield, District Judge, Presiding. D.C. No. CV-93-01363-RCB.
 Before: NOONAN and TROTT, Circuit Judges, and WALLACH.**
 NOONAN, Circuit Judge.
 
 
 1
 Theodore Chester Kulas appeals the judgment of the district court in favor of defendants in his civil action for forced medication with antipsychotic drugs.
 
 FACTS
 
 2
 Kulas was charged by the State of Arizona with crimes involving dealing in drugs. On April 22, 1993 there was a hearing in the Superior Court of Pima County before Howard Hantman, Judge Pro Tempore, as to Kulas's competency to stand trial. Kulas was represented by appointed counsel. Two appointed experts reported that he was incompetent. The court orally found him incompetent, adding "but there is substantial probability he will be restored to competency within a reasonable period of time." The court committed him to "the Maricopa County Department of Health Services, Madison Street Jail ... attention Dr. Jack Potts." The court orally declared: "It is the order of the Court he be evaluated at that facility for a period of 45 days...." The court set a status conference for June 8 and orally directed counsel "to contact Dr. Potts or the other treating physician before the June 8th status conference to obtain telephonically the status of the defendant's competency and progress, if any, at the facility." In a minute order entered the same day the court repeated in writing that Kulas was committed "to be evaluated" and that counsel should contact "Dr. Potts or other treating physician." The court proceeded under Arizona Rule of Criminal Procedure 11.5(b) which stated at the time that if the court determines the defendant is incompetent "but that there is a substantial probability that he will be restored to competency within a reasonable period of time, it shall order him committed to the supervision of an institution...."
 
 
 3
 For the next six weeks Kulas was at the Madison Street Jail. There were various diagnoses of his mental condition. At times he would cooperate in taking medication. At other times he would not. Haldol and Ativan were initially prescribed on an "as needed" basis, meaning that Kulas could take them at his discretion. He was moved from Pod A, the institution's most restrictive pod, to Pod C. On May 12 he agreed with Dr. Potts to see how well he could control himself without taking Lithium. On May 18 and May 22 he was verbally abusive to staff. On May 24 Kulas refused to submit to an x-ray, necessary to determine if he had active tuberculosis; he did consent to it on May 26; he continued, however, to refuse to submit to a blood test, necessary to determine if he had syphilis. On May 25 Dr. Hoffert noted a need to discuss with Dr. Potts the possibility of forcibly medicating him. On the same day Kulas was moved back to Pod A.
 
 
 4
 On May 28 Kulas was "loud, threatening, demanding" and "banging on the cell door." Dr. Hoffert viewed him as "unmanageable" and annotated his chart: "May not refuse medication." He did not, however, have the discussion with Dr. Potts that he had noted as necessary. At 8:30 p.m. Kulas spit out the medication that had been prescribed. In accordance with Dr. Hoffert's instructions, a nurse forcibly injected Kulas with Haldol, Cogentin and Ativan.
 
 
 5
 Haldol and Ativan are antipsychotic drugs that work synergistically. Cogentin is given to counter the side effects. In the light of this forcible injection Kulas did not resist doses of Haldol and Cogentin on May 29 and May 30, which he took orally. By June 17 he had improved considerably. He was assigned to Pod D and ordered to return to court as restored.
 
 PROCEEDINGS
 
 6
 In 1993 Kulas brought this action under 42 U.S.C. § 1983 against the doctors involved in his treatment at the Madison Street Jail. He brought a separate civil rights action against Judge Pro Tempore Hantman. The cases were consolidated. The district court found the judge absolutely immune and granted summary judgment in his favor. After a bench trial the court found that, of the physician defendants, only Dr. Hoffert was responsible for the forced medication. The court ruled that Dr. Hoffert had acted under the authority of a valid court order because Judge Hantman's reference to "treating physician" should be interpreted to imply treatment and that "forced medication is within the contemplation of treatment." The court buttressed this inference by interpreting Rule 11.5(b)(3)'s reference to "restoration of competency" to include "the notion of treatment." The court placed greatest weight on Judge Hantman's testimony that "his order was the standard order that he used at the time, and apparently used by the rest of the judges on the court at the time and that it specifically contemplated treatment" and that Judge Hantman "expected restoration to competency, including treatment which included forced medication."
 
 
 7
 As an alternative ground for its decision, the district court held that the requirements of Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), had been met because Kulas was mentally ill, medication was in his best interests, and "on balance, and it is barely on balance," Dr. Hoffert was presented with a situation "sufficient to conclude" that Kulas was a danger to others, although not to himself. The court added that although it was unnecessary to make a finding, Kulas had suffered no injuries warranting damages. Judgment was entered for all defendants.
 
 
 8
 Kulas appeals.
 
 ANALYSIS
 
 9
 To force antipsychotic drugs on a prisoner or on a detainee awaiting trial is impermissible under the federal constitution, "absent a finding of overriding justification and a determination of medical appropriateness." Riggins v. Nevada, 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). The serious side effects that such medication can have on mind and personality, physical condition and life itself, have caused the court to lay down this rigorous test. Harper, 494 U.S. at 229-230, 110 S.Ct. 1028. In the context of both Harper and Riggins such an invasion of the human person can only be justified by a determination by a neutral factfinder that the antipsychotic drugs are medically appropriate and that the circumstances justify their application.
 
 
 10
 We must, of course, give the same full faith and credit to a state court order as state courts would give the order. Southeast Resource Recovery Facility Auth. v. Montenay Int'l Corp., 973 F.2d 711, 713 (9th Cir.1992). Arizona construes court orders by their plain language. Stallings v. Spring Meadows Apartment Complex Ltd. Partnership, 185 Ariz. 156, 159, 913 P.2d 496, 497 (Ariz.1996) (en banc). There is not a word in Judge Hantman's oral order spoken in court referring to antipsychotic drugs, nor is there any such reference in his minute order. There is not the slightest indication that he found that action by the treating physicians would require forcible administration of antipsychotic drugs. Judge Hantman could have revised his order to express such an intent. State v. Rendel, 18 Ariz.App. 201, 206, 501 P.2d 42 (Ariz.Ct.App.1972). Until he did so, the order, not his unexpressed intent, governed. Id.
 
 
 11
 Effective January 1, 1997, Ariz. R.Crim. P. 11.5(b)(3) was amended to require that a court determine whether a defendant should be subject to involuntary medication. This belated recognition of the Riggins rule came too late to save the practice of Judge Pro Tempore Hantman. The change does ensure that other Arizona judges will not make his mistake. The change also lessens the precedential significance of this opinion, which, nonetheless, may be of use in any jurisdiction not as enlightened as post-1996 Arizona.
 
 
 12
 The alternative basis justifying the administration of the drugs was that Kulas's forced medication passed "the Harper standards...." However, the district court only paid attention to the substantive requirements of Harper for the involuntary administration of antipsychotic drugs and did not acknowledge the procedural requirements. The Supreme Court has stated that the administration of such drugs "cannot withstand challenge if there are no procedural safeguards to ensure the prisoner's interests are taken into account." Harper, 494 U.S. at 233, 110 S.Ct. 1028. Not only were there no procedures in place, Dr. Hoffert did not even consult Dr. Potts before ordering the medication. His action cannot be defended.
 
 
 13
 Defendants' reliance on the reasoning of the Fourth Circuit in Hogan v. Carter, 85 F.3d 1113 (4th Cir.1996), is misplaced. In Hogan, the Fourth Circuit held that the procedural safeguards provided for in Harper do not apply in emergency situations. Hogan, 85 F.3d at 1117. In Hogan, the inmate "had been in the throes of an uncontrollable seizure for ... three hours." Id. at 1114. Here, by contrast, Kulas was merely loud and uncooperative. Dr. Hoffert was unconcerned enough that he merely marked Kulas's chart "may not refuse medication" and left. There is no evidence that Kulas posed such an imminent and serious danger to himself or others that the minimal procedural requirements of Harper--notice and the right to be present at and participate in a hearing--could not be met.
 
 
 14
 Nonetheless, Dr. Hoffert, although he was wrong, was not unreasonable in interpreting Judge Hantman's order as authorizing his action. After all, Judge Hantman himself understood the order in this sense. A reasonable belief that the conduct was lawful is sufficient to secure qualified immunity. Act Up! Portland v. Bagley, 988 F.2d 868, 871-72 (9th Cir.1993). There is no need for a remand to determine this immunity as the district court, too, thought this interpretation was reasonable. Qualified immunity, which "provides ample protection to all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), therefore, affords our basis for affirming the judgment as to Dr. Hoffert. The rulings of the district court as to the other defendants present no difficulty. The judgment is AFFIRMED.
 
 
 15
 TROTT, Circuit Judge, concurring.
 
 
 16
 I agree wholeheartedly with Judge Noonan's conclusion that Dr. Hoffert is entitled at least to qualified immunity. I write separately, however, because I believe--as did the district court--that a strong case can be made for the proposition that Dr. Hoffert is entitled also to quasi-judicial immunity, which is absolute. When all is said and done, Kulas is suing the doctor for doing what he was expected to do pursuant to Judge Hantman's valid order. Such behavior falls squarely within the rule that officials implementing valid court orders are immune for their conduct in so doing.
 
 
 17
 This circuit has repeatedly stated that quasi-judicial immunity protects those who execute [state] court orders from liability in civil rights actions, and we have so held in Coverdell v. Dep't of Social and Health Services, 834 F.2d 758, 764 (9th Cir.1987) (citing Gregory v. Thompson, 500 F.2d 59, 65 n. 6 (9th Cir.1974); Gillibeau v. City of Richmond, 417 F.2d 426, 429 (9th Cir.1969); Haldane v. Chagnon, 345 F.2d 601, 604 (9th Cir.1965)). Moreover, we are not alone. "Other circuits have held that persons who faithfully execute valid court orders are absolutely immune from liability for damages in civil rights actions challenging conduct authorized by the order." Coverdell, 834 F.2d at 764-65 (citing cases from First, Third, Seventh, and Eighth Circuits). In a nutshell, judicial immunity extends "to those who carry out the orders of judges." Slotnick v. Garfinkle, 632 F.2d 163, 166 (1st Cir.1980).
 
 
 18
 The rationale for immunizing persons who execute court orders is apparent: "[t]he fearless and unhesitating execution of court orders is essential if the court's authority and ability to function are to remain uncompromised." Coverdell, 834 F.2d at 765. The rationale protects the state employee who merely carries out the court's directive. In fact, "such persons are themselves integral parts of the judicial process." Id. (quoting Briscoe v. La Hue, 460 U.S. 325, 335, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)).
 
 
 19
 I see no material distinction between Kulas's allegations and the gravamen of the charges at issue in Haldane v. Chagnon, 345 F.2d at 601. Haldane was a plaintiff in a divorce case. Because of his bizarre behavior, the presiding judge ordered Haldane to undergo an involuntary mental health examination "to determine the state of [his] mental health, ... and that such measures be taken for [his] best interests and protection, in respect to supervision, care or treatment as may be necessary and provided by law." Id. at 602. Because of this examination, Haldane sued the judge who ordered it and the bailiff who filed the examination petition. In affirming the district court's dismissal of Haldane's lawsuit, we said,
 
 
 20
 In our view, these specifically alleged and documented facts bring the plaintiff-appellant to an insurmountable barrier, namely the time honored rule of judicial immunity, a rule which is indispensable to the free and fearless administration of justice.... The only remaining problem, therefore, with respect to the defendant judges ... is related to consideration of whether or not doing the acts for which they are sought to be held responsible in damages, they were acting within the course and scope of their judicial duties. [They were].
 
 
 21
 The defendant bailiff acted at the direction of the judge to whom he was immediately and directly responsible. In so doing, he was part of the body of the court itself. In Hoffman v. Halden, [268 F.2d 280 (9th Cir.1959) overruled on other grounds by Cohen v. Norris, 300 F.2d 24, 29-30 (9th Cir.1962) ], we held that a jailer or keeper was not liable under the Civil Rights Act for 'performing a duty which the law at that time required him to perform.'
 
 
 22
 Id. at 603-04.
 
 
 23
 Hoffman involved allegations of Civil Rights Act violations similar to Kulas's brought by a patient against state hospital doctors who treated him for mental illness after he had been committed to their care and for treatment by a state court. In Hoffman, we quoted the Sixth Circuit's statement in Kenney v. Fox, 232 F.2d 288, 290 (6th Cir.1956) that "the institutional doctors should not be expected or even permitted to go behind a court order of commitment of a person to a state mental hospital where, on its face, the order appears to be valid." Hoffman, 268 F.2d at 300 (quoting Kenney, 232 F.2d at 290). We held that the only question remaining after the validity of the court order is established is whether the defendant doctors' alleged tortious acts fell within its scope. Here, the district court answered that question by calling as a witness Judge Hantman, the state judge who issued the disputed order. Unless we are willing to find the state court judge not credible--which on this record we cannot do--his testimony, as cloaked in the protection of the Tenth Amendment, must carry the day. As we said in Southeast Resource Recovery Facility Auth. v. Montenay Int'l Corp., 973 F.2d 711, 714 (9th Cir.1992), about a state court order, "the district court cannot refuse to give the state court judgment full faith and credit because it disagrees with the state court's interpretation of [the statute]."
 
 
 24
 The context in which we review this order arises from an inmate's attempt to extract damages from the state employee who followed the judge's order, and who was thus an "integral part of the judicial process." It would be no less than bizarre to make the doctor pay for what the judge's order contemplated.
 
 
 25
 Dr. Hoffert, the only treating physician responsible for the forced medication of Kulas, was acting pursuant to a valid court order. Therefore, the doctor is entitled to absolute immunity from liability. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir.1979) (holding that state actors are "clothed with immunity from suit because they acted under authorization of the state court order"); see also, Lockhart v. Hoenstine, 411 F.2d 455, 460 (3d Cir.1969) (holding that "there exists a[ ] well-grounded principle that any public official acting pursuant to court directive is also immune from suit."). Thus, I concur in the correct result reached by my colleague.[1]
 
 
 26
 WALLACH, Judge, dissenting.
 
 
 27
 I do not believe that the forced medication of Mr. Kulas can reasonably be seen as falling within the scope of Judge Hantman's orders. Accordingly, Dr. Hoffert's actions are not entitled to either qualified or quasi-judicial immunity.
 
 
 28
 In Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court enunciated principles for deciding when the acts of a government official are entitled to qualified immunity:
 
 
 29
 ... government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 30
 The Court stated that the limits of qualified immunity should be defined in objective terms, with the reasonableness of an official's conduct measured by reference to clearly established law. Id. at 818-19, 102 S.Ct. 2727. If the law at the time an action occurred was not clearly established, "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." Id. at 818, 102 S.Ct. 2727. However, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." Id. at 818-19, 102 S.Ct. 2727.
 
 
 31
 At the time of Dr. Hoffert's alleged actions, the right of inmates in regard to forced medication had been clearly established in Washington v. Harper, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), and Riggins v. Nevada, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). Those cases made clear that "forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness." Riggins, 504 U.S. at 135, 112 S.Ct. 1810 (emphasis added). No such finding was made here, either by Judge Hantman or Dr. Hoffert. As Judge Noonan correctly observes, "[t]here is not a word in Judge Hantman's oral order spoken in court referring to antipsychotic drugs, nor is there any such reference in his minute order." Given this fact, the absence of any reference to medication whatsoever, and the clear standards set out in Harper and Riggins, I do not believe Dr. Hofferts could have reasonably relied upon Judge Hantman's orders to justify his action.
 
 
 32
 Because the state of the law was clearly established at the time of Dr. Hoffert's alleged actions, the principal question before this Court for qualified immunity purposes is whether Dr. Hoffert's alleged act of ordering Kulas forcibly medicated can be considered "reasonable." I believe it cannot. Dr. Hoffert was required to either respect Kulas' right to refuse unwanted medication, or seek a proper determination that forcibly injecting Kulas with antipsychotic drugs was both justified and medically appropriate.
 
 
 33
 Dr. Hoffert, however, sought neither a court order determining that forced medication was necessary, nor a neutral administrative forum to make such a decision. See, e.g., Harper, 494 U.S. at 228-36, 110 S.Ct. 1028 (finding that a three member committee of independent medical professionals, after providing an inmate with notice, the right to be present at an adversary proceeding, and the right to cross-examine witnesses, could properly order an inmate involuntarily medicated with antipsychotic drugs).[1] In fact, Dr. Hoffert did not even confer with Dr. Potts before making his decision. Instead, he simply marked Kulas' chart "may not refuse medication" and left. Certainly, this action did not provide Kulas with the basic procedural protections envisioned by Harper and Riggins--standards of which, as a prison doctor, Dr. Hoffert should have been reasonably aware. See, e.g., Doby v. Hickerson, 120 F.3d 111 (8th Cir.1997) (affirming that a psychiatrist's decision to involuntarily medicate an inmate with antipsychotic medications, without providing him the minimal procedural protections set out in Harper, precluded the psychiatrist from receiving qualified immunity).
 
 
 34
 Had Judge Hantman's court orders indicated Kulas was to be treated with antipsychotic drugs, or even that Kulas could be treated with such drugs if necessary, Dr. Hoffert could claim quasi-judicial and qualified immunity by arguing that, although the idea of forcibly medicating Kulas had in fact never been properly considered by Judge Hantman, Dr. Hoffert reasonably believed otherwise. Dr. Hoffert's actions would then fall within the scope of what he believed to be a valid court order.
 
 
 35
 The problem with this argument, which appears to carry great weight with my colleagues, is its underlying premise concerning Judge Hantman's court orders. Nothing in Judge Hantman's orders indicate that he, as a neutral factfinder, had determined that the use of antipsychotic drugs was medically appropriate and that the circumstances justified their application. Rather, his minute entry order simply provided:
 
 
 36
 THE COURT FINDS pursuant to Rule 11.5(b)(3) that defendant is not competent to stand trial but that there is a reasonable probability that he may become competent.
 
 
 37
 IT IS ORDERED the defendant be committed to the Maricopa County Department of Health Services, Mental Health Unit, Madison Street Jail, for a period of up to 45 days to be evaluated at that facility....
 
 
 38
 * * * *
 
 
 39
 Counsel are directed to contact Dr. Potts or other treating physician prior to that Status Conference to obtain information of defendant's competency.
 
 
 40
 As a prison doctor, Dr. Hoffert should reasonably have been aware that forcing antipsychotic drugs on an inmate is impermissible, absent a finding of overriding justification and a determination of medical appropriateness. Similarly, he should reasonably have been aware that Judge Hantman's orders--silent as they were on the issues of forced medication and antipsychotic drugs--did not in any way indicate that Judge Hantman had made such a finding and determination (which, in fact, he had not). Judge Hantman's orders spoke to Kulas' commitment to the Maricopa County Department of Health Services and his evaluation in that facility; they did not speak to his treatment by antipsychotic drugs. Neither Judge Hantman's after the fact statement that he intended for his order to cover forced medication, nor his reference to an "attending physician," detract from this simple fact. If Dr. Hoffert had had any questions in this regard, he could simply have inquired whether Judge Hantman's orders covered forced medication. However, Dr. Hoffert did not take even this reasonable step before ordering antipsychotic drugs administered to Kulas. Against this background, I cannot see how Dr. Hoffert's alleged action can reasonably be seen as falling within the scope of Judge Hantman's orders. Thus, I must dissent from the result reached by my colleagues.
 
 
 41
 As a final point, I also wish to express my respectful disagreement with Judge Trott concerning the deference that this Court should give Judge Hantman's testimony. In his concurrence, Judge Trott notes:
 
 
 42
 [u]nless we are willing to find the state court judge not credible--which on this record we cannot do--his testimony [that he intended his order to cover forced medication, if necessary], as cloaked in the protection of the Tenth Amendment, must carry the day.
 
 
 43
 The question before this Court, however, is only whether Dr. Hoffert is entitled to quasi-judicial or limited immunity because his act either fell within the scope of a state court order and/or his action was a reasonable interpretation of that order. Had this question previously been resolved by a state court, we, of course, would be required to give the state court's decision full faith and credit. This would be true even if we disagreed with the Court's findings. Similarly, if the issue in this case were whether Kulas should have been committed for evaluation, this Court would be required to give Judge Hantman's orders preclusive effect.
 
 
 44
 This Court does not, however, have to defer to Judge Hantman's view of what his order encompassed. Judge Hantman's testimony only addressed the issue of what he, at the time of the trial in a case in which he had been involved as a defendant, believed his order encompassed. His testimony does not resolve the underlying issue of whether Dr. Hoffert's interpretation of the court's order was reasonable, in light of the standards set out in Harper and Riggins, and it does not and can not effect objective interpretation of the order's language. To hold the contrary is unwise in the extreme. It subjects every order of every court to subjective interpretation based on testimony by a subpoenaed judge.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed. R.App. P. 34(a); 9th Cir. R. 34-4
 
 
 **
 The Honorable Evan J. Wallach, United States Court of International Trade, sitting by designation
 
 
 [1]
 I agree also with the district court's conclusion that Kulas failed in his attempt to demonstrate that the Due Process standards articulated in Washington v. Harper, 494 U.S. 210, 221-36, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) were violated in this matter
 
 
 [1]
 In contrast to the administrative procedures at issue in Harper, the Maricopa County Sheriff's Office Policy and Procedures for Involuntary Psychotropic Medications ("Policy and Procedures") only allowed for involuntary medication if an inmate "pose[d] a clear and immediate threat to himself or others...." Plaintiff's Informal Opening Brief, Excerpts of Record, Exhibit 18, p 3. As Judge Noonan correctly observes, however: "[t]here is no evidence that Kulas posed such an imminent and serious danger to himself or others that the minimal procedural requirements of Harper--notice and the right to be present at and participate in a hearing--could not be met." Accordingly, Dr. Hoffert cannot reasonably rely on the Policy and Procedures as a basis for not providing Kulas with the basic procedural protections of Harper and Riggins