Docket No. 96773–Agenda 4–September 2004.

In re 
ROBERT S. (The People of the State of Illinois, Appellee, v. Robert S., Appellant).

Opinion filed November 18, 2004.

JUSTICE RARICK delivered the opinion of the court:

Respondent, Robert S., was found unfit to stand trial on a charge not specified in the record. He was admitted to the Elgin Mental Health Center (EMHC). Subsequently, respondent’s treating psychiatrist filed a petition seeking the involuntary administration of psychotropic medication pursuant to section 2–107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2–107.1 (West 2000)). After a two-day hearing, in which respondent represented himself, the circuit court of Kane County granted the petition. Respondent appealed, challenging, 
inter alia
, the circuit court’s decision to appoint, as an “impartial medical expert” pursuant to the “independent examination” provisions of section 3–804 of the Code (405 ILCS 5/3–804 (West 2000)), a person who was not qualified to conduct the examination. Respondent also contended that (1) section 2–107.1 of the Code “was never intended to be applied to non-dangerous pretrial detainees,” (2) the application of section 2–107.1 deprived him of his constitutional right to a fair trial, and (3) reversal was warranted because the attorney in his pending criminal case was not notified of the hearing on the petition. The appellate court rejected these and other arguments. 341 Ill. App. 3d 238. We allowed the respondent’s petition for leave to appeal (177 Ill. 2d R. 315), and allowed the Mental Health Association of Illinois and the Mental Health Project of the University of Chicago Law School’s Mandel Legal Aid Clinic to file a brief as 
amici curiae 
in support of appellee.

Before this court, respondent contends that the appellate court erred in holding that (1) section 2–107.1 of the Code was constitutionally applied to him, a pretrial detainee who had been found unfit to stand trial, (2) he was not deprived of his right to due process of law where the independent examination guaranteed by statute was performed by an unlicensed intern with only a master’s degree in psychology, and (3) he had no due process right to have notice of the forced-treatment action provided to his criminal defense attorney. We begin our review with a detailed recitation of pertinent facts.

BACKGROUND

On November 19, 2001, respondent’s psychiatrist, Dr. Romulo Nazareno, filed a petition seeking to involuntarily administer psychotropic medication to respondent. The allegations of the petition tracked the requirements of section 2–107.1(a–5)(4) of the Code (405 ILCS 5/2–107.1(a–5)(4) (West 2000)), which provides in pertinent part as follows:

“(4) Authorized involuntary treatment shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present:

(A) That the recipient has a serious mental illness or developmental disability.

(B) That because of said mental illness or developmental disability, the recipient exhibits any one of the following: (i) deterioration of his or her ability to function, (ii) suffering, or (iii) threatening behavior.

(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.

(D) That the benefits of the treatment outweigh the harm.

(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.

(F) That other less restrictive services have been explored and found inappropriate.

(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment.”

The petition in this case specifically alleged that, because of his mental illness, respondent had exhibited a deterioration of ability to function, suffering, and threatening behavior. Dr. Nazareno requested authorization to administer Risperidone–a medication respondent had previously taken, briefly, without noticeable side effects–or, alternatively, Haldol, Haldol Deconate, and Cogentin. Nazareno also sought permission to conduct testing to monitor respondent’s reaction to the medication.

On November 26, 2001, the circuit court held a competency hearing pursuant to respondent’s request to represent himself. At that time, the court denied respondent’s request. Respondent filed a motion to reconsider. On November 30, 2001, respondent appeared in court with appointed counsel from the Legal Advocacy Service of the Illinois Guardianship and Advocacy Commission for a hearing on pending matters. The circuit court denied respondent’s motion to reconsider, but granted his request for an independent evaluation pursuant to section 3–804 of the Code (405 ILCS 5/3–804 (West 2000)). However, rather than appoint the 
psychiatrist
 who had previously conducted independent examinations of respondent, the court, pursuant to the cost-conscious request of the State, appointed the Kane County Diagnostic Center to perform the evaluation. Respondent’s counsel objected, noting: “Everyone associated with the Diagnostic Center is a psychologist and not a psychiatrist and therefore does not have the expertise when it comes to medication. So every time we go to the Diagnostic Center, we’re starting behind the 8-ball because of that very thing.”

The circuit court acknowledged:

“Although Mr. Rose is right, I suppose what appears to be on paper in the–on the way I make the decisions on these things, I don’t think that I would really say psychiatrist versus psychologist; and therefore you’re behind the 8-ball. I look at the issues and what the facts are and rule accordingly.”

The court persisted in its decision to appoint the Kane County Diagnostic Center.

At a pretrial conference on January 4, 2002, the circuit court revisited the issue of self-representation. Noting “representations” that respondent had represented himself ably in the past, the court reversed its prior ruling, and allowed respondent to proceed 
pro se.

Hearing in this matter commenced on January 18, 2002. The State’s first witness was Dr. Nazareno.

Nazareno diagnosed respondent with paranoid schizophrenia. He testified that respondent’s symptoms included hallucinations, delusions, sleeplessness, irritability, and an overall deterioration in the ability to function. For instance, respondent complained of sleep deprivation as a result of auditory hallucinations. Moreover, respondent suffered delusions. He believed that the government had implanted a microchip in his brain in an effort to read his mind. Respondent claimed that EMHC staff and patients were sending messages to a “mind reader” by actions such as rubbing their chins or adjusting their eyeglasses. In addition, respondent threatened to kill an EMHC patient who respondent believed was having a sexual relationship with women intended for respondent.

Dr. Nazareno testified that respondent’s symptoms had subsided when he was medicated on a previous occasion with Risperidone. However, once the medication order expired, respondent again experienced auditory hallucinations, sleep deprivation, and delusional thinking. It was at that time that respondent threatened to kill a member of the EMHC staff.

Nazareno recommended administering Risperidone to respondent because, in the past, he had responded well to the drug without side effects. Nazareno suggested, however, that higher doses might be indicated. As alternatives, Nazareno recommended Haldol, Haldol Deconate (injectable), and, for side effects, Cogentin. Nazareno testified that Risperidone has fewer side effects than Haldol. According to Nazareno, Risperidone can cause dizziness, light-headedness, seizure, nausea, vomiting, muscular rigidity, difficulty swallowing, constipation, tardive dyskinesia, and neuroleptic malignant syndrome. He did not elaborate on the incidence of those side effects.

Nazareno acknowledged that Haldol has more severe side effects than Risperidone. He did not specify what those side effects might be. What 
is
 clear from his testimony is that Haldol would be the drug of choice if respondent refused to take Risperidone. Nazareno admitted that he had no way of knowing if respondent would have an adverse reaction to Haldol.

Nevertheless, Dr. Nazareno opined that the benefits of administering a psychotropic medication would outweigh the harm. He stated that respondent lacked the capacity to make a reasoned decision about potential side effects and benefits of the treatment. According to Dr. Nazareno, respondent’s psychosis was the reason he could not make a knowledgeable decision whether to take the medication. Nazareno had tried less restrictive treatments, such as counseling and group therapy, but he deemed them ineffective without medication.

On cross-examination, Dr. Nazareno admitted that respondent had never threatened him and that he had never personally witnessed respondent threaten others. Nazareno also acknowledged that, during the court proceeding, he did not see a deterioration in respondent’s functioning, and he noted that respondent did not exhibit his usual symptoms, such as talking to himself. However, Nazareno stated that respondent’s behavior, and the way in which he asked questions, showed some paranoia and delusions. For instance, during questioning, respondent insinuated that Nazareno must also have heard voices. Nazareno pointed out that there are times during which an afflicted individual can contain delusions by focusing on a task.

The State next called Lesley Kane, an intern at the Kane County Diagnostic Center (KCDC). Kane conducted the court-ordered, independent examination of respondent. Kane’s examination consisted of interviewing respondent for 60 to 90 minutes, talking to respondent’s case worker, and reviewing two to three years of respondent’s records. Noting that the “witness ha[d] been qualified as an expert” in a previous case, the circuit court qualified Kane as an expert over respondent’s objection.

Citing symptoms similar to those identified by Nazareno, Kane diagnosed respondent with paranoid schizophrenia. With respect to whether respondent had exhibited a deterioration of his ability to function, suffering, or threatening behavior, Kane stated that respondent had indeed become increasingly tense and agitated, verbally aggressive, and more threatening in the months preceding the hearing. Moreover, his sexual preoccupations had increased, and EMHC staff had noted an increase in his use of profanity. Kane further testified that respondent’s illness has existed for a period marked by the continuing presence of symptoms, noting that respondent has had a history of delusions dating back to the 1970s. Without elaboration, Kane stated her opinion that the benefits of psychotropic medication would outweigh the harm. Kane noted that respondent’s behavior posed a risk to himself and to others, and that any side effects of the medication could be dealt with effectively. Kane did not address the nature or likelihood of side effects that might result from forced administration of psychotropic medication. Kane opined that respondent’s suffering, the deterioration of his ability to function, and his violent and threatening behavior would decrease with medication.

Kane also concluded that respondent lacked the capacity to make a reasoned decision about psychotropic medication. Respondent told her he did not need psychotropic medication because he did not have a mental illness. When she spoke with him, he was evasive and avoided any discussion of his inability to sleep, hallucinations, or delusions. According to Kane, respondent was unaware of the severity of his illness, which is typical of people diagnosed with schizophrenia. When she asked him if he ever heard voices other people did not hear, he responded, “I believe other people hear the voices as well.”

Regarding less restrictive alternatives, Kane noted that respondent had been offered psychosocial therapy; however, because respondent lacked insight into his illness, “it doesn’t seem as though that alone is going to be helpful.” Kane also noted that, in individuals with schizophrenia, therapy is more often augmentation to medication. Kane opined “to a reasonable degree of psychological certainty” that respondent met the criteria for utilization of psychotropic medication.

On cross-examination, Kane admitted that, during her independent examination of respondent, she did not observe respondent suffering from delusions or hallucinations. She also acknowledged that respondent was not exhibiting such symptoms at the hearing.

Kane conceded that she had never done an evaluation without supervision. She stated that she had been supervised in her evaluation of respondent, though there is nothing in the record to reveal the nature or extent of that supervision. In fact, she admitted that a supervisor was not present when she conducted her examination of respondent and did not review respondent’s charts or interview anyone with pertinent information. Kane stated that a licensed psychologist “has to assist” in a fitness examination, “but for an involuntary medication evaluation, that is not a requirement.” When respondent asked why, Kane replied, “I didn’t develop the law. I don’t know.” Kane did not cite “the law” to which she referred.

The State recalled Dr. Nazareno. Nazareno testified that respondent does not have the capacity to make a reasoned and rational choice regarding whether he needs medication. Nazareno noted that respondent does not believe he is ill. Nazareno added that respondent’s judgment is so impaired by his illness that he sees only the risks, and not the benefits, of the medication.

Under cross-examination, Nazareno acknowledged that respondent understood the potential severity of the possible side effects of the medications proposed. He admitted that respondent was proceeding in a “logical” and “goal-oriented” manner in his cross-examination. However, Nazareno persisted in his opinion that respondent did not have the capacity to make a decision as to whether he should take psychotropic medication. Respondent continued:

“Q. So, you’re saying I am logical, coherent, and goal-oriented, and they [psychotropic drugs] were prescribed for a period of three months a couple years ago, but you’re saying I wouldn’t know what the benefits are?

A. Yes. Even though I explain to you, you don’t take it. You don’t understand.”

Kelli Childress, a former assistant State’s Attorney, testified that she first met respondent in 1999 when she was assigned to a hearing in which respondent was involved. On or about October 31, 2001, Childress received a telephone call from respondent. Respondent told Childress that he remembered her from the 1999 hearing and he had been thinking about her ever since. Respondent accused Childress of helping the government with a scheme to read his mind. Respondent believed that he and Childress were supposed to be together and that the government had indicated to him that Childress felt the same way. Respondent asked Childress if she would help him get out of EMHC so they could be together. Childress told respondent she was involved with someone else and the information he had was incorrect. Childress stated that she felt threatened during the conversation.

Respondent called Childress again on December 31, 2001. According to Childress, the tone of this conversation was less accusatory and more romantic. Respondent told Childress she was beautiful, he had feelings for her, and the government had informed him that they were supposed to be together. Respondent stated that he thought about marrying Childress, having children, and moving to California. Respondent told Childress that the government had informed him that she was romantically involved with other patients at EMHC and with a player for the Chicago Bears.

Childress testified she was familiar with respondent’s case and knew why he was at EMHC. She was afraid that he could become violent if he believed she was part of a government scheme to read his mind. As a result, after both calls, Childress contacted the State’s Attorney’s office and the court liaison at EMHC. In addition, following the first call, she contacted local police. Childress did not hear from respondent after the second call. On cross-examination, Childress admitted that respondent did not specifically threaten her.

Mark Thomas, a licensed clinical social worker at EMHC, testified that he was respondent’s primary therapist. Thomas stated that respondent’s psychiatric diagnosis was paranoid schizophrenia. According to Thomas, respondent’s condition had been deteriorating over the months preceding the hearing, with increased agitation, verbal outbursts, and verbal aggression.

Thomas testified that respondent believed the voices he heard were caused by a chip implanted by the government. Respondent thought the chip enabled the government to read his mind. On two occasions in the three months prior to the hearing, respondent became agitated with Thomas because respondent believed Thomas was “signaling the mind readers” by rubbing his limbs. A third incident occurred when Thomas sided with a technician who was involved in a dispute with respondent. At that time, respondent cursed at Thomas. Thomas considered respondent’s behavior during the third incident to constitute a threat.

Thomas testified that respondent admitted he suffered from hallucinations and delusions. The hallucinations and delusions centered on female celebrities, but had included staff at EMHC. In addition, respondent told Thomas that he wanted to have a relationship with Childress. Respondent also told Thomas that his conversations with Childress had gone well and that she had been receptive.

Thomas further stated that respondent believed certain women had been “reserved” for him by the mind readers. Respondent became verbally abusive when he believed those women had ignored him or had been having relationships with other EMHC patients. Respondent confronted one patient whom he believed was having a sexual relationship with one of his “reserved” women.

Thomas opined that respondent suffered as a result of hearing voices. Thomas believed that respondent’s ability to function had deteriorated in the three months prior to the hearing. Thomas also stated that, of his 36 patients, respondent posed the highest risk. Thomas stated that respondent was “in the upper echelon” of patients who frightened him.

On cross-examination, Thomas testified that respondent had a “remarkable ability” to contain his psychosis. Nevertheless, he thought that respondent had exhibited evidence of mental illness in the courtroom. As examples, Thomas noted respondent’s allusions to government mind readers and his claim that the government had implanted a chip in his body.

The State next called respondent as a witness. Respondent objected. The trial court sustained respondent’s objection on the basis that respondent was at EMHC because he had been found unfit to stand trial in an underlying criminal proceeding. The State then rested. Respondent requested two weeks to subpoena his witnesses, and the court continued the matter until February 1, 2002.

When court reconvened, respondent called as his first witness Denise Dojka, a clinical psychologist at EMHC and respondent’s psychological therapist. Dojka stated that respondent suffered from paranoid schizophrenia. She had never seen respondent participate in any violent behavior. Nevertheless, based on a risk assessment she had conducted of respondent, Dojka believed he was one of the more dangerous people in his unit.

On cross-examination, Dojka testified that respondent heard voices that called him derogatory names and woke him at night. Respondent believed the voices were from the government and they were transmitted through an implant in his head. The voices informed respondent that women who were interested in a sexual relationship with him were being brought to other patients. Respondent told Dojka that he would have liked to have had a relationship with Childress and that he wanted Childress to have his children. However, he no longer believed it was possible to have a relationship with Childress because he believed she had been given large sums of money to have sex with another patient.

Dojka testified that she considered respondent dangerous because he had several risk factors. According to Dojka, respondent’s history of violence, symptoms of mental illness, refusal of treatment, anger, and the lack of feasibility of future plans all contributed to a finding that respondent posed at least a moderate risk of committing violence in the future, especially since he was not medicated.

Dojka feared that respondent would commit violence against Childress and Lynette Krueger, Dojka’s diagnostic psychology student. Respondent wanted to have relationships with both women, but he believed that they were sleeping with others. That made respondent feel betrayed and resentful.

Dojka believed that respondent needed to be medicated. She noted that, on a previous occasion, when he was medicated for a 90-day period, his sleeping improved, he was much more relaxed, he participated in activities, and he seemed to be functioning at a higher level. Dojka also believed that respondent was suffering. He had told her he felt “tormented” by the voices.

Becky Mitchell, an activity therapist at EMHC, testified that between October 2001 and February 2002, she had accompanied respondent to two or three activities. On those occasions, respondent did not cause her any problems and he did not have any problems with the other patients. However, Mitchell opined that respondent had the potential to be dangerous to others. Mitchell’s opinion was based on respondent’s status as a mental health patient, the statements of clinicians, and her past experiences with other patients. On cross-examination, Mitchell testified that respondent had told her he heard voices that tormented him.

Respondent’s last witness was Jose Padilla, an activity staff member at EMHC. Padilla testified that he never had to restrict respondent as a result of his behavior. Padilla did not observe respondent express any anger toward other patients. On cross-examination, Padilla acknowledged that he saw respondent about once a month.

Based upon the foregoing testimony, the circuit court ruled that respondent was subject to the involuntary administration of psychotropic medication for a period not to exceed 90 days. The court found that, because of his mental illness, respondent had exhibited a deterioration of ability to function, suffering, and threatening behavior. Further, the court found that the suggested benefits of the treatment outweighed the potential for harm, respondent lacked the capacity to make a reasoned decision about the treatment, and other less restrictive services had been explored, but were found inappropriate. The court subsequently denied respondent’s motion to reconsider. Respondent appealed. The appellate court affirmed. 341 Ill. App. 3d 238. This timely appeal followed.

ANALYSIS

Respondent raises constitutional questions concerning the construction and application of sections 2–107.1 and 3–804 of the Code. The standard of review for determining whether an individual’s constitutional rights have been violated is 
de novo
. 
People v. Burns
, 209 Ill. 2d 551, 560 (2004). We apply the same standard in matters of statutory construction. 
In re Mary Ann P.
, 202 Ill. 2d 393, 404 (2002). Statutes enjoy a strong presumption of constitutionality, and this court has a duty to construe statutes in a manner that upholds their validity whenever reasonably possible. 
Hill v. Cowan
, 202 Ill. 2d 151, 157 (2002).

As a preliminary matter, we note that this case is moot. Section 2–107.1 of the Code provides that an order authorizing the administration of involuntary treatment shall, in no event, be effective for more than 90 days. 405 ILCS 5/2–107.1(a–5)(5) (West 2000). The 90 days have long since passed, and the circuit court’s order no longer has any force or effect. Hence, it is impossible for this court to grant meaningful relief, and any decision we render is essentially advisory in nature. See 
In re Mary Ann P.
, 202 Ill. 2d at 401; 
In re Barbara H.
, 183 Ill. 2d 482, 490 (1998). Generally, a court of review will not consider moot or abstract questions or render advisory decisions. 
In re Mary Ann P.
, 202 Ill. 2d at 401. However, a reviewing court may review otherwise moot issues pursuant to the public interest exception to the mootness doctrine. 
In re Andrea F.
, 208 Ill. 2d 148, 156 (2003). The criteria for application of the public interest exception are: (1) the public nature of the question; (2) the desirability of an authoritative determination for the purpose of guiding public officers; and (3) the likelihood that the question will recur. 
In re Andrea F.
, 208 Ill. 2d at 156; 
In re Mary Ann P.
, 202 Ill. 2d at 402. This case satisfies those criteria.

This court has previously held that the procedures courts must follow to authorize the involuntary medication of mental health patients involve matters of “substantial public concern.” 
In re Mary Ann P.
, 202 Ill. 2d at 402. Moreover, because of the short duration of orders authorizing involuntary treatment, and respondent’s history of mental illness, it is likely that the circumstances present in the case at bar will recur without the opportunity for resolutionary litigation before the case is rendered moot by expiration of the order. See 
In re Mary Ann P.
, 202 Ill. 2d at 402-03; 
In re Barbara H.
, 183 Ill. 2d at 491-92; 
In
 
re Evelyn S.
, 337 Ill. App. 3d 1096, 1102 (2003). Finally, having reviewed appellate court decisions in this area, we believe an authoritative determination is desirable at this time.

There is no question that involuntary mental health services, including the involuntary administration of psychotropic drugs, involve a “ ‘massive curtailment of liberty.’ ” 
In re Barbara H.
, 183 Ill. 2d at 496, quoting 
Vitek v. Jones
, 445 U.S. 480, 491, 63 L. Ed. 2d 552, 564, 100 S. Ct. 1254, 1263 (1980). The United States Supreme Court has, alternatively, described the forced administration of psychotropic drugs as a “particularly severe” interference with a person’s liberty. See 
Riggins v. Nevada
, 504 U.S. 127, 134, 118 L. Ed. 2d 479, 488, 112 S. Ct. 1810, 1814 (1992). One who is held on pending criminal charges retains this liberty interest notwithstanding his or her status as a pretrial detainee. See generally 
Sell v. United States
, 539 U.S. 166, 156 L. Ed. 2d 197, 123 S. Ct. 2174 (2003);
 Washington v. Harper
, 494 U.S. 210, 108 L. Ed. 2d 178, 110 S. Ct. 1028 (1990).

Respondent argues that the criteria for involuntary administration of psychotropic drugs enunciated in 
Sell 
are controlling in our analysis in this case. We disagree. As the Court’s decision in 
Sell
 clearly indicates, differing criteria and analyses may apply to the decision to involuntarily medicate a pretrial detainee who has been found unfit to stand trial, depending upon the 
purpose
 for which authorization to medicate has been sought.

In 
Sell
, the State sought authorization for the involuntary administration of drugs for the sole purpose of rendering the defendant competent to stand trial. Citing 
Harper 
and 
Riggins
, the Court, in 
Sell
, stated: “the Constitution permits the Government involuntarily to administer antipsychotic drugs to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial” if certain criteria are satisfied. A court must conclude that (1) 
important
 governmental interests are at stake, (2) involuntary medication will 
significantly further 
those concomitant state interests, (3) involuntary medication is 
necessary
 to further those state interests, and (4) that the administration of the drugs is 
medically appropriate
, 
i.e.
, in the patient’s best medical interest in light of his medical condition. 
Sell
, 539 U.S. at 180-81, 156 L. Ed. 2d at 211-13, 123 S. Ct. at 2184-85.

In 
Sell
, the Court made clear that the standards it announced were restricted to the context of the case before it:

“We emphasize that the court applying these standards is seeking to determine whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely, the interest in rendering the defendant 
competent to stand trial.
 A court need not consider whether to allow forced medication for that kind of purpose, if forced medication is warranted for a 
different
 purpose, such as the purposes set out in 
Harper
 related to the individual’s dangerousness, or purposes related to the individual’s own interests ***.” (Emphases in original.) 
Sell
, 539 U.S. at 181-82, 156 L. Ed. 2d at 213, 123 S. Ct. at 2185.

The petition in the instant case sought authorization to treat respondent on 
Harper 
grounds. The petition alleged that, because of his mental illness, respondent had exhibited a deterioration of ability to function, suffering, and threatening behavior. As the appellate court noted:

“[T]he trial court was not asked to decide whether respondent could be subject to the involuntary administration of psychotropic medication solely for the purpose of rendering him competent to stand trial. Indeed, the record is barren of any evidence that the petition to administer psychotropic medication was filed solely for the purpose of fitness for trial. *** Instead, the trial court reviewed each of the factors listed in section 2–107.1(a–5)(4) of the Code (405 ILCS 5/2–107.1(a–5)(4) (West 2000)) and found that the State proved each factor by clear and convincing evidence. The court found that respondent suffered [from] a mental illness, *** which resulted in a deterioration of his ability to function, suffering, and threatening behavior. Moreover, the court found that the benefits of the proposed treatment outweighed the harm and that less restrictive alternatives were inappropriate. It is evident that the trial court granted the State’s petition because it found the involuntary administration of psychotropic medication to be medically appropriate. Notably, in rendering its decision the trial court never mentioned respondent’s fitness to stand trial.” 341 Ill. App. 3d at 258.

Like the appellate court, we believe that respondent’s reliance upon 
Sell 
is misplaced. Respondent advances no plausible argument to convince us that, for purposes of section 2–107.1 of the Code, pretrial detainees should be treated differently than any other person in need of treatment.

However, that assessment does not end our due process inquiry; it simply shifts the focus of our analysis to basic requirements of due process as expressed in 
Harper 
and prior cases.

In 
Mathews v. Eldridge
, 424 U.S. 319, 335, 47 L. Ed. 2d 18, 33, 96 S. Ct. 893, 903 (1976), the Supreme Court set forth three factors that must be considered when determining whether an individual has received the “process” that the Constitution finds “due”:

“First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.”

By weighing these factors, courts can determine whether the government has met the fundamental requirements of due process–the opportunity to be heard at a meaningful time and in a meaningful manner. 
Mathews
, 424 U.S. at 333, 47 L. Ed. 2d at 32, 96 S. Ct. at 902.

Addressing the first factor, there is no question that the private interest affected by the forced administration of psychotropic drugs is substantial. As we have previously noted, the United States Supreme Court has described the forced administration of psychotropic drugs as a “particularly severe,” interference with a person’s liberty. 
Riggins
, 504 U.S. at 134, 118 L. Ed. 2d at 488, 112 S. Ct. at 1814.

In 
Harper
, the Court spoke of the serious, and perhaps, permanent, consequences that psychotropic medication may have upon the recipient’s life:

“The purpose of the drugs is to alter the chemical balance in a patient’s brain, leading to changes, intended to be beneficial, in his or her cognitive processes. [Citation.] While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects. *** [S]ide effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs. [Citation.] Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face. [Citation.] *** A fair reading of the evidence, however, suggests that the proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%.” 
Harper
, 494 U.S. at 229-30, 108 L. Ed. 2d at 203-04, 110 S. Ct. at 1041.

See also 
Riggins
, 504 U.S. at 134, 118 L. Ed. 2d at 488-89, 112 S. Ct. at 1814-15 (quoting this passage from 
Harper
 ); 
United States v. Williams
, 356 F.3d 1045, 1054-55 (9th Cir. 2004) (quoting from 
Harper
); 
In re Qawi
, 32 Cal. 4th 1, 14-15, 81 P.3d 224, 231, 7 Cal. Rptr. 3d 780, 788 (2004) (observing that antipsychotics “have been the cause of considerable [reversible 
and 
potentially permanent] side effects ***. On rare occasions, use of these drugs has caused sudden death”); 
Kulas v. Valdez
, 159 F.3d 453, 455-56 (9th Cir. 1998) (noting “[t]he serious side effects that such medication can have on mind and personality, physical condition and life itself”); Physicians’ Desk Reference 1787, 2464-65 (57th ed. 1999) (detailing extensive warnings and precautions for the use of Risperidone and Haldol, and noting, with respect to Risperidone, that the “risk of developing tardive dyskinesia and the likelihood that it will become irreversible are believed to increase as the duration of treatment and the total cumulative dose of antipsychotic drugs administered to the patient increase”); 2 M. Perlin, Mental Disability Law §3B–2, at 370-71 (1999) (detailing “toxic effects” of antipsychotic drugs); E. Goode, 
Leading Drugs for Psychosis Come Under New Scrutiny
, N.Y. Times, May 20, 2003, at A1 (describing “the stiffness, trembling and other Parkinson’s-like symptoms commonly seen in patients taking older antipsychotics like Haldol”).

Suffice it to say that the involuntary administration of psychotropic drugs can have a profound and sometimes irreversible effect upon a recipient’s personality and physical health. It would therefore seem that the “private interest” at stake in this type of proceeding is one of considerable magnitude. Deprivations of property are reversible and the consequences of erroneous deprivation may be remedied to some degree; however, the forced use of psychotropic drugs may effect modifications of brain chemistry and patterns of thought which are not so easily rectified, if they are at all. Moreover, use of these drugs may entail adverse 
physical 
side effects that are irreversible. In light of these sobering facts, we must once more confront the central question in this appeal: What process is due?

Again, 
Harper 
is instructive. In 
Harper
, a psychiatrist in the correctional facility where the respondent was housed sought to administer antipsychotic medication to respondent over his objection. 
Harper
, 494 U.S. at 214, 108 L. Ed. 2d at 193, 110 S. Ct. at 1033. In response to the Supreme Court’s decision in 
Vitek
, correctional authorities had developed a policy that provided for review of the treating psychiatrist’s decision by a special committee consisting of a psychiatrist, a psychologist, and the associate superintendent of the correctional center, none of whom could be involved in the inmate’s treatment or diagnosis. 
Harper
, 494 U.S. at 215, 108 L. Ed. 2d at 194, 110 S. Ct. at 1033. Pursuant to the policy, the committee could authorize forced treatment with antipsychotic drugs, so long as the majority voted to do so and 
the psychiatrist was a member of the majority. Harper
, 494 U.S. at 215-16, 108 L. Ed. 2d at 194, 110 S. Ct. at 1033. Noting that the “risks associated with antipsychotic drugs are for the most part 
medical 
ones, best assessed by 
medical 
professionals” (emphases added) (
Harper
, 494 U.S. at 233, 108 L. Ed. 2d at 205, 110 S. Ct. at 1042), the Court held that the internal review procedure in 
Harper 
satisfied requirements of due process. The Court held that adequate procedures existed, noting, in particular, the “independence of the decisionmaker.” 
Harper
, 494 U.S. at 233, 108 L. Ed. 2d at 205, 110 S. Ct. at 1043.

Two components of the procedure in 
Harper 
strike us as significant for present purposes, as they seem to have been prominent factors in the 
Harper 
decision: there was an 
independent review 
of the treating psychiatrist’s evaluation and prescription, and that review was, conspicuously, overseen by a 
psychiatrist
, a “medical professional” who would have been able to assess the “risks associated with antipsyhotic drugs.” See
 Harper
, 494 U.S. at 233, 108 L. Ed. 2d at 205, 110 S. Ct. at 1042
.

Harper 
seems to us the touchstone of due process when considering the propriety of forced medication with psychotropic drugs. The procedure sanctioned by the Supreme Court in 
Harper
 addressed two essential features of due process in this context: (1) “independent review” of the treating psychiatrist’s evaluation and proposed course of medication, and (2) review by a “medical professional” who is qualified to prescribe psychotropic medications and trained in their possible side effects. This brings us to the second and third 
Mathews
 considerations.

With respect to the second 
Mathews 
factor, the risk of an erroneous deprivation of the respondent’s rights through the procedures used in this case is obvious. The value of additional procedural safeguards is clear. Only a physician–such as a psychiatrist–can prescribe medication; a psychologist cannot. An intern in psychology most certainly cannot. These limitations exist for a reason: the medical community recognizes that a certain level of knowledge is necessary to safely prescribe medication, to fully recognize its beneficial effects as well as its adverse side effects, to understand its interaction with other drugs, to anticipate the consequences of using it on certain at-risk groups. It seems self-evident that the policy sanctioned in 
Harper 
required an independent assessment by a psychiatrist who was not involved in treatment or diagnosis for this very reason. In 
Harper
, the Court stressed that the “risks associated with antipsychotic drugs are for the most part 
medical
 ones, best assessed by 
medical 
professionals.” (Emphases added.) 
Harper
, 494 U.S. at 233, 108 L. Ed. 2d at 205, 110 S. Ct. at 1042.

The respondent in this case was denied the safeguards inherent in having what amounts to a second opinion by one qualified to give it on 
every aspect 
of the statute in question–what 
Harper 
appears to require. Kane was not qualified to give meaningful testimony about the possible harmful side effects of the proposed medications, and she did 
not
 give meaningful testimony. For that matter, neither did Nazareno render what we would consider “meaningful” testimony on the subject. What little he had to say about the possible side effects of Risperidone had no obvious relevance to the possible side effects of Haldol, a subject he did not address at all–this, notwithstanding the fact that he no doubt intended to use Haldol on respondent, since he testified that Haldol would have to be used if respondent refused to take Risperidone 
voluntarily
. He seemed to have forgotten that the whole point of this proceeding was the 
involuntary 
treatment of respondent. We note in passing that this lack of logic is commensurate with Nazareno’s simplistic assessment that respondent lacked the capacity to make a decision whether or not to take the drugs simply because he refused to do what Nazareno told him to do. We note Nazareno’s answer during respondent’s cross-examination: “Even though I explain to you, you don’t take it. You don’t understand.”

We have previously expressed our concern that psychotropic substances may be misused by medical personnel, and subverted to the objective of patient control rather than patient treatment. 
In re C.E.
, 161 Ill. 2d 200, 215-16 (1994). While we do not mean to imply that authorization was sought for an improper purpose in this case–there was in fact sufficient evidence to establish threat, suffering, and deterioration–we must insist upon adequate safeguards in 
every 
case. Otherwise, abuse of the process 
will 
undoubtedly occur.

In our opinion, the circuit court should have heeded the objection of respondent’s counsel prior to his departure from this case: “Everyone associated with the Diagnostic Center is a psychologist and not a psychiatrist and therefore does not have the expertise when it comes to medication. So every time we go to the Diagnostic Center, we’re starting behind the 8-ball because of that very thing.” Ironically, the circuit court implicitly acknowledged counsel’s point: “Although Mr. Rose is right, I suppose what [
sic
] appears to be on paper in the–on the way I make the decisions on these things, I don’t think that I would really say psychiatrist versus psychologist; and therefore you’re behind the 8-ball.” We believe the circuit court failed to appreciate the significant difference in expertise between a psychiatrist and a psychologist, and the safeguards that another psychiatrist would have provided in the decisionmaking process.

Apparently, the circuit court had, in the past, recognized the significance of appointing a psychiatrist in a proceeding such as this. The court had in fact appointed a psychiatrist to do an independent examination in prior proceedings, and declined to do so on this occasion only because the State raised concerns over costs. Pursuant to the third prong of the 
Mathews 
analysis, we recognize the State’s “fiscal” interest in cost-cutting; however, given the devastating consequences that could result from a less than fully informed decision, this is hardly the situation in which to pinch pennies. To do so, would, in our view, deny respondent due process.

It has been held, with respect to the Sexually Violent Persons Commitment Act (725 ILCS 207/1 
et seq. 
(West 1998)), that due process requires that a respondent be “entitled to defend himself on a ‘level playing field’ and that the State not be permitted to maintain a strategic advantage over the respondent when ‘that advantage casts a pall on the proceedings.’ ” 
In re Detention of Trevino
, 317 Ill. App. 3d 324, 330 (2000), quoting 
In re Detention of Kortte
, 317 Ill. App. 3d 111, 115-16 (2000). We believe respondent was denied “a level playing field” and a fundamental requirement of due process: the opportunity to be heard in a meaningful manner. See 
Mathews
, 424 U.S. at 333, 47 L. Ed. 2d at 32, 96 S. Ct. at 902.

However, we do not believe our legislature intended such a result. Rather, it is our opinion that the legislature, attempting to apply section 3–804 in two different contexts (proceedings for involuntary commitment and for involuntary administration of drugs), assumed that the use of disjunctive language therein would apprise circuit courts of the need to appoint an expert appropriate to the proceeding in question.

Section 3–804 of the Code provides in pertinent part:

“The respondent is entitled to secure an independent examination by a physician, qualified examiner, clinical psychologist or other expert of his choice. If the respondent is unable to obtain an examination, he may request that the court order an examination to be made by an impartial medical expert pursuant to Supreme Court Rules 
or
 by a qualified examiner, clinical psychologist or other expert.” (Emphasis added.) 405 ILCS 5/3–804 (West 2000).

The statute uses the terms “medical expert” and “physician” interchangeably. “Physician” is defined in the Code as “any person licensed by the State of Illinois to practice medicine in all its branches” and “includes a psychiatrist.” 405 ILCS 5/1–120 (West 2002). Section 3–804 appears in Chapter III of the Code, a chapter that addresses admission of the mentally ill to mental health facilities. In proceedings to that end, an examination by a “qualified examiner, clinical psychologist or other expert” may suffice for purposes of due process. That initial inquiry, after all, does not encompass forced medication. Of course, when forced medication with psychotropic drugs is sought pursuant to section 2–107.1 of the Code (405 ILCS 5/2–107.1(a)(4) (West 2000)), medical expertise 
is 
required of the independent examiner if the independent examination is to have any meaningful impact upon the decisionmaking process. It was, likely, the legislature’s recognition of this fact that led to the use of the word “or” after the term “medical expert” and before the terms “qualified examiner, clinical psychologist or other expert.” 405 ILCS 5/3–804 (West 2000). The legislature no doubt intended that the circuit court appoint an independent expert appropriate to the proceeding.

It is our duty to construe a statute in a manner that upholds its validity whenever reasonably possible. 
Hill
, 202 Ill. 2d at 157. Therefore, we construe section 3–804 of the Code in this manner.

Finally, we address respondent’s contention that his criminal defense attorney was entitled to notice of the hearing in this proceeding pursuant to section 2–107.1(a–5)(1) of the Code (405 ILCS 5/2–107.1(a–5)(1) (West 2000)), which provides in pertinent part:

 “The petitioner shall deliver a copy of the petition, and notice of the time and place of the hearing, to the respondent, his or her attorney, any known agent or attorney-in-fact, if any, and the guardian, if any ***.”

Although respondent urges us to decide this issue on due process grounds, we find it is unnecessary to pass on the constitutional question. See 
Beahringer v. Page
, 204 Ill. 2d 363, 370 (2003) (a court will consider a constitutional question only where essential to the court’s disposition).

Respondent came to be in a mental health facility because he was found unfit to stand trial in a criminal proceeding. In that proceeding, he was represented by an attorney. All of the parties to this action were aware of that proceeding. Although the purpose of the instant proceeding was to determine whether psychotropic medication should be forced upon respondent for his own benefit and/or the safety of those around him, ultimately, there may be consequences pertinent to the pending criminal matter.

We note that the language concerning notification in section 2–107.1 (a–5)(1) of the Code is very broad and general. It refers to notification of, 
inter alios
, a respondent’s “attorney” and “any known agent,” without qualification or limitation. We have previously construed this section to require notification of “any other interested parties to the proceeding.” See 
In re C.E.
, 161 Ill. 2d at 226. In the absence of any restrictive language in the statute, we believe respondent’s criminal defense attorney qualifies as a party to whom notice is due. In the very least, criminal counsel was a “known agent,” and thus should have been given notice of this proceeding.

In sum, we reject respondent’s contentions that the 
Sell 
criteria should have been applied in this case and that section 2–107.1 of the Code is inapplicable to pretrial detainees. We, thus, affirm that portion of the appellate court judgment that held the criteria of section 2–107.1 were applicable in this context. However, we reject the appellate court’s determination that the requirements for an independent examination under section 3–804 were satisfied in this case, and we find that deficiency constituted a due process violation pursuant to the reasoning of the Supreme Court, as expressed in 
Harper. 
We hold that the statute itself is not unconstitutional when properly applied. Finally, we hold that the plain language of section 2–107.1(a–5)(1) of the Code required notice of this proceeding to respondent’s criminal defense attorney.

Appellate court judgment affirmed in part

and reversed
 
in part.