2016 IL App (2d) 141022
Nos. 2-14-1022 & 1023 cons.
Opinion filed March 30, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MIROSLAVA P., Alleged to be a Person Subject to Involuntary Administration of Psychotropic Medication | ) ) ) ) ) ) | Appeal from the Circuit Court of Kane County<br><br>No. 14-MH-78 |
| (The People of the State of Illinois, Petitioner-Appellant v. Miroslava P., Respondent-Appellee). | ) ) ) | Honorable<br>William J. Parkhurst,<br>Judge, Presiding. |

| | | |
|---|---|---|
| *In re* MIROSLAVA P., Alleged to be a person Subject to Involuntary Admission | ) ) ) ) ) | Appeal from the Circuit Court of Kane County<br><br>No. 14-MH-84 |
| (The People of the State of Illinois, Petitioner-Appellant v. Miroslava P., Respondent-Appellee). | ) ) ) | Honorable<br>William J. Parkhurst,<br>Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice Schostok concurred in the judgment and opinion.
Justice Spence dissented, with opinion.

**OPINION**

¶ 1    The State petitioned for both the involuntary admission of and the involuntary administration of psychotropic medication to respondent, Miroslava P., a Bulgarian citizen. At three early status hearings, respondent requested that the Bulgarian consulate be notified of the admission proceedings. The State did not ensure notification. One month after the petitions had

been filed, respondent moved to strike the petitions on the basis that the consulate had not been notified. Respondent cited the Vienna Convention's requirement that foreign consulates be notified when their citizens are detained. Vienna Convention on Consular Relations and Optional Protocol on Disputes, art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 ("[I]f [a foreign national] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is *detained in any other manner.*" (Emphasis added.)). Respondent also argued that the Illinois Mental Health and Developmental Disabilities Code (Code) required the notification, but she referenced, without precise citation, only the Code's requirement that a respondent's guardian be notified. 405 ILCS 5/1-100 *et seq.* (West 2014). She did not point to section 3-609, the more relevant portion of the Code, which required that two persons designated by respondent receive copies of the admission petition and accompanying documentation. 405 ILCS 5/3-609 (West 2014). The court, under a second judge, denied the motions to strike. It stated that, whatever the Vienna Convention's requirements, a violation of its terms did not provide a basis to strike the petitions. Additionally, it did not believe that the Code applied to the situation at hand, because the Code did not specifically address foreign sovereigns. Subsequently, the court, under a third judge, heard the State's petitions and granted them. Respondent moved to reconsider, arguing that the petitions never should have proceeded on the merits, because the consulate had not been notified. This time, respondent cited section 3-609 of the Code as a primary authority for her contention that two persons of respondent's choosing, specifically the consulate, should have received copies of the admission petition and accompanying documentation. The State argued that respondent's late citation to the proper authority precluded the trial court from reconsidering the

notice issue. The court stated that it would reconsider the issue, given that a mistake of law had been made. The court granted the motion to reconsider, finding that noncompliance with the requirements of section 3-609 warranted a reversal of both the admission order and the medication order. The State appeals, and, for the reasons that follow, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3     Respondent is a 40-year-old Bulgarian citizen. Her primary language is Bulgarian, although she can speak English. She was educated at the University of Poldiv and earned a science degree. She met her husband at the university, and, in the early 2000's, they came to the United States. In 2006, in Chicago, respondent gave birth to a daughter. In 2009, respondent moved back to Bulgaria with her daughter. (It is unclear whether she and her husband formally divorced.) Respondent then suffered from a mental-health episode and was hospitalized in Bulgaria. Current healthcare providers did not obtain respondent's Bulgarian health records, but, according to respondent's mother, respondent responded positively to treatment. In late 2012, respondent flew back to the United States to try to reconcile with her husband. She left her daughter in the care of family.

¶ 4     Respondent's husband was not amenable to reconciliation, and he obtained an order of protection against her. In 2013, respondent violated the order of protection, and her husband sought to press charges. The State prosecuted respondent for the misdemeanor of violating the order of protection. The trial court found respondent unfit to stand trial. In July 2013, the court ordered respondent to the Elgin Mental Health Center. Doctors diagnosed respondent with psychotic disorder, not otherwise specified. On June 23, 2014, the State filed a petition for the involuntary administration of psychotropic medication. Soon after, in July 2014, the one-year

period for finding respondent fit to stand trial expired. Respondent was never found fit for trial. The State dismissed the criminal charge.

¶ 5    On July 14, 2014, upon the dismissal of the criminal charge, the State filed the instant petition for involuntary admission. The medication petition remained pending. The admission petition named only respondent's mother in the space for "spouse, parent, guardian, or substitute decision maker[s]." Respondent's mother first spoke with healthcare providers on July 8, 2014, after flying in from Bulgaria. (Previously, according to medical records, respondent did not want to involve her family in treatment.)

¶ 6    In an "alternatives to treatment" document filed July 18, 2014, healthcare providers reported that both respondent and her mother had "expressed a desire and intent for [respondent] to be released to her mother's care [to] travel home to Bulgaria together." However, respondent's mother wanted respondent to receive treatment prior to leaving. Respondent was not consistent in her wishes, and she alternatively stated that she "hates" her mother and would prefer to stay with friends in the United States. The healthcare providers advised that respondent's psychiatric condition be stabilized prior to international travel.

¶ 7    On July 30, 2014, respondent, through her attorney, filed written motions to strike the admission and medication petitions. She asserted that the State had not complied with its obligation to notify the Bulgarian consulate, and she argued that the appropriate relief was to strike the petitions. In the motions, which were essentially identical in content, counsel recounted earlier requests for notification. On July 2, 2014, counsel met with respondent. However, in counsel's view, respondent's poor English skills prevented meaningful communication. On July 3, 2014, at a hearing (the transcripts from which are not in the record), counsel argued that the State had an obligation under the Vienna Convention to notify the

Bulgarian consulate. On July 7, 2014, at a hearing (the transcripts from which are not in the record), counsel again argued that the State had an obligation to notify the Bulgarian consulate. The State responded that respondent's counsel should bear the responsibility of notifying the Bulgarian consulate. On July 9, 2014, counsel met with respondent in the presence of a Bulgarian interpreter. At that time, respondent expressed a desire to contact the Bulgarian consulate. On July 18, 2014, at a hearing (the transcripts from which are not in the record), counsel again requested that the Bulgarian consulate be notified. On July 21, 2014, counsel forwarded to the State a link to the United States Department of State Consular Notification and Access instruction manual, which included sample notification letters and contact information for the Bulgarian consulate.

¶ 8    On July 25, 2014, counsel *again* informed the court that respondent wanted the Bulgarian consulate to be notified of the commitment proceedings. She stated that the Vienna Convention required that the Bulgarian consulate be notified when one of its citizens was involuntarily detained, whether in a criminal proceeding or a mental-health proceeding. The State acknowledged that it had the consulate's contact information, but it responded that it did not believe that the Vienna Convention applied or that it was obligated to notify the consulate. The court asked respondent to draw up her request in a written motion, and, as a result, counsel filed the above-mentioned motions to strike the petitions.

¶ 9    On August 1, 2015, the trial court, under a second judge, conducted a hearing on the motions to strike the petitions. At the hearing, Tom Usiak, a social worker for the health center, testified that, on July 29, 2014, he notified the Bulgarian consulate of the pending petitions. He faxed the consulate a one-page, five-sentence letter that cited the mental-health statute under

which respondent was being detained and listed a date for the upcoming hearing. He obtained telephonic confirmation that the fax had been received by consul Simeon Stoilov.

¶ 10     On cross-examination, Usiak stated that "someone" directed him to notify the consulate. Counsel asked who had directed him to notify the consulate. The State objected, citing hearsay, and the trial court sustained the objection. Counsel asked whether the notification was within the standard practice of the health center. The State objected, arguing that any topic that did not address respondent's notice in particular was outside the scope. The court sustained the objection. Usiak confirmed that the one-page letter was the only documentation he ever sent to the consulate and that he had never previously contacted the consulate. Usiak further acknowledged that the letter did *not* inform the consulate of respondent's particular circumstances, such as that she had already been detained for nearly one year under the criminal system and that the State was seeking an additional 90 days under the civil system.

¶ 11     Respondent argued that whatever notice had been sent to the consulate was substantively insufficient and, at a minimum, untimely. Respondent noted that the Vienna Convention required the notice to be sent within three days of her detention. She argued that, even if the Vienna Convention did not control, the Code required notification within 24 hours. She explained that the consulate could reasonably be viewed as a "guardian" under the Code, which requires that a guardian be notified within 24 hours.

¶ 12     Counsel did *not* cite section 3-609, the Code's specific provision as to involuntary admission,[1] but, as it will become the center of the instant appeal, we note that section 3-609 states:

_____

[1] Counsel *did* cite the Code's specific provision as to involuntary administration of medication. Section 2-107.1 states in pertinent part: "The petitioner shall deliver a copy of the

"Within 12 hours after his admission, the respondent shall be given a copy of the petition and a statement as provided in Section 3-206. *Not later than 24 hours*, *** a copy of the petition and statement shall be given or sent to the respondent's attorney *and guardian*, if any. The respondent shall be asked if he desires such documents sent to any other persons, *and at least 2 such persons designated by the respondent* shall receive such documents. The respondent shall be allowed to complete no less than 2 telephone calls at the time of his admission to such persons as he chooses." (Emphases added.) 405 ILCS 5/3-609 (West 2014).

¶ 13    When counsel argued that the Code required notification within 24 hours, the trial court interrupted:

"COURT: Here's something I want to tell you about the Mental Health Code, and I don't want to cut you off. Would you agree with me that the appellate court *** has been very strict in the language of the Code?

COUNSEL: Yes.

COURT: I read the phrase strict as that inclusion is very strictly construed, as is [*sic*] omission. So, I am wondering if the omission of any type of language referring to consulates or foreign sovereigns, dual citizens, precludes me from adding it."

¶ 14    The trial court denied respondent's motions to strike the petitions. It found that any violation of the Vienna Convention did not provide a basis to strike the petitions but rather could provide relief for the wronged diplomatic entity. The court noted that case law has "settled the

petition, and notice of the time and place of the hearing, to the respondent, his or her attorney, any known agent or attorney-in-fact, if any, *and the guardian*, if any, no later than 3 days prior to the date of the hearing." (Emphasis added.) 405 ILCS 5/2-107.1 (West 2014).

issue at hand." The court cited *People v. Najera*, 371 Ill. App. 3d 1144 (2007), and, elsewhere in its order, *People v. Montano*, 365 Ill. App. 3d 195 (2006). Additionally, the court found that the Code did not require notification of the consulate. Therefore, in the court's view, there was no violation of the Code. The court ordered the petitions to be heard.

¶ 15    On August 15, 2015, the trial court, under a third judge, conducted the hearings on the petitions for involuntary admission and medication. Respondent noted for the record her continuing objection to the trial court's ruling on the motions to strike the petitions.

¶ 16    At the admission hearing, Dr. Timothy Olenek testified that he was respondent's treating psychiatrist. Respondent suffered from psychotic disorder not otherwise specified. She did not suffer from psychotic symptoms of hallucinations or catatonia. Rather, she suffered from a severe thought disorder, which included the flight of ideas, loose associations, perseveration, and disorganized, nonlinear conversation. Even with the help of a Bulgarian interpreter, whom Olenek employed for the first time *after* the initial evaluation, respondent's answers to questions were illogical and disorganized. Respondent walked the halls of the center and "stalk[ed]" staff by standing outside their doors and talking loudly to them. She did not appear to understand the prior criminal charge against her or why she remained in the center. She provided inconsistent information on almost every topic. An exception was that she asked about her daughter on a daily basis. The separation from her daughter causes respondent a great amount of sadness. Another of respondent's frequent concerns was the status of her "papers." The trial court granted the admission petition, noting that respondent had repeatedly interrupted the proceedings with comments and gestures. It found the health center to be the least restrictive environment. In a separate hearing on the medication petition, Olenek testified extensively regarding the positives and negatives of the recommended medications. The court approved the treatment plan and

granted the medication petition. The medication order authorized the use of seven medications, with an additional eight alternative medications should any of the initial seven prove ineffective.

¶ 17    On September 16, 2014, the trial court, still under the third judge, conducted a hearing on respondent's motion to reconsider. Respondent's main argument was that the petitions never should have been allowed to proceed on the merits; the court, under the second judge, should have stricken them based on the failure to timely notify the Bulgarian consulate and provide it with the admission petition and the appropriate documentation. Respondent accepted the second judge's conclusion that the Vienna Convention, even if violated, did not provide a basis for her requested individual relief. Thus, she cited the Code as a primary, rather than a secondary, authority. Specifically, for the first time, she cited section 3-609 (although she had, arguably, started to describe it in substance if not name at the August 1, 2014, hearing, before the court rejected the Code's application). 405 ILCS 5/3-609 (West 2014). Again, that section requires that, "[n]ot later than 24 hours, *** a copy of the petition and statement shall be given or sent to the respondent's attorney and guardian, if any. The respondent shall be asked if he desires such documents sent to any other persons, *and at least 2 such persons designated by the respondent shall receive such documents*." (Emphasis added.) *Id*. This time, rather than stress the duty to notify a guardian, she stressed the duty to see that two persons designated by the respondent receive the admission papers. The State stood on its arguments from the initial hearing, including its position that respondent's attorney could have notified the consulate and that, in any event, respondent was not prejudiced, because the consulate was ultimately notified of the admission and medication hearings.

¶ 18    The trial court granted the motion to reconsider, finding that a mistake of law had been made. It based its ruling on section 3-609: "[U]nder this 3-609, when you get committed you

have a right to—like on the game shows, you have a right to make a lifeline call out, and I think asking that the information go to the consulate, that's a call out." The court found that the consulate was not notified according to the requirements of section 3-609. The consulate did not receive a copy of the admission petition, which would have detailed respondent's circumstances. The court rejected the State's position that respondent's counsel could have fulfilled the notification duties on behalf of respondent: "[T]his idea that compliance *** falls upon the Public Defender? No. It's State action and the State must—and I don't mean you, [assistant State's Attorney], but somebody, the hospital, the State's attorney's office, somebody needs to send the form."[2] The court stated that it would take a strict-compliance approach, thereby either rejecting or affording little weight to the State's argument concerning prejudice, and it vacated the admission ruling. Next, it vacated the medication ruling, reasoning that the medication ruling had sprung from an invalid admission ruling.

¶ 19    The trial court was troubled that respondent had not been informed of her rights in her primary language, prior to the doctor's evaluation for admission. However, this did not influence the court's decision. The court clarified that it based its decision solely on section 3-609: "My finding is based on 3-609."

¶ 20    The trial court concluded by addressing what it perceived to be a lack of relevant experience and specialization on the part of the court and the attorneys:

"I have not felt very comfortable going to *** mental health court. I show up there a couple of times a year and always feel like I'm reinventing the wheel *** but the

---

[2] This exact quote was made in reference to the Vienna Convention's notification requirement. The court repeated its substance, though less eloquently, when discussing the dispositive issue of compliance with section 3-609 notification requirements.

fact that the Public Defender now has an attorney that is specifically assigned to this court, I think gives everybody, the judicial system, the State's Attorney's Office, an opportunity to reconsider whether a specific judge or a specific division of the State's Attorney's Office should be going there all the time."

This appeal followed.

¶ 21                                    II. ANALYSIS

¶ 22    On appeal, the State argues that the trial court abused its discretion in granting the motion to reconsider, because: (1) it should have found forfeited respondent's late citation to section 3-609; (2) any noncompliance with section 3-609 was harmless; and (3) even if noncompliance with section 3-609 justified vacating the admission order, it did not justify vacating the medication order.  The State acknowledges that its appeal is moot, because the 90-day period for which it sought to have respondent admitted and treated has lapsed.  However, the State contends that the public-interest exception to the mootness doctrine applies.  For the reasons that follow, we agree that the public-interest exception applies, but we disagree with the merits of the State's arguments.

¶ 23                          A. Public-Interest Exception

¶ 24    The public interest exception to the mootness doctrine is to be narrowly construed.  *In re Commitment of Hernandez*, 239 Ill. 2d 195, 201-02 (2010).  The party seeking review of a moot issue must make a clear showing that: (1) the question is of a substantial public nature; (2) an authoritative determination is needed for future guidance; and (3) the circumstances are likely to recur.  *Id*. at 202.

¶ 25    The parties agree that the first criterion is met.  In general, issues of statutory compliance and the rights of a mental-health respondent are considered questions of a public nature.  *In re*

*Rita P.*, 2014 IL 115798, ¶ 36; *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1070-71 (2011). Moreover, this case raises the question of whether a foreign consulate representative may qualify under section 3-609 as a person designated by a respondent to receive a copy of the petition for admission.

¶ 26    The second and third criteria are also met.  There is need for guidance regarding the requirements of section 3-609.  As respondent concedes, there are currently no cases that expressly say that the State is required to comply with a respondent's right to designate at least two people to receive copies of the admission petition and that the failure to do so can provide grounds to deny the petition or vacate an admission order.  We disagree with respondent that the reason for the dearth in case law is that "mental health facilities understand and fully comply with the plainly stated law, meaning no guidance is necessary" (citing *In re Marriage of Eckersall*, 2015 IL 117922, ¶ 16, for the proposition that the absence of conflicting precedent can mean that guidance is not necessary).  To the contrary, the obligation to contact the consulate upon respondent's request was so far from obvious in the instant case that, initially, the State refused, in open court, to ensure notification.  The health center's social worker was not permitted to testify as to the center's notification practices.  Moreover, despite respondent's raising the issue multiple times before the trial court, the court did not find the notification failure dispositive until very late in the proceedings, upon granting respondent's motion to reconsider.  In this vein, it is likely that, were we not to rule on the issue, a future State actor will neglect to fulfill the statute's requirements and/or a trial court might fail to recognize the error as potentially dispositive.  For these reasons, we hold that the public-interest exception to the mootness doctrine applies.

¶ 27            B. Trial Court's Ruling on the Motion to Reconsider

¶ 28    The State contends that respondent forfeited the question of the State's compliance with section 3-609.  Alternatively, it argues that the trial court abused its discretion on the motion to reconsider by determining that the State's noncompliance warranted vacating the admission and medication orders.  The State requests that we reverse the court's ruling on the motion to reconsider and reinstate the admission and medication orders for the record, though it understands that the orders would now be expired.

¶ 29    For the reasons that follow, the issue of the State's compliance with section 3-609 was not forfeited.  On the merits, the trial court correctly determined that the State violated section 3-609.  Case law authorizes a court to vacate an admission order due to a violation of section 3-609.  And, in view of all the circumstances, the court did not abuse its discretion in choosing to vacate the admission order here.  Additionally, the court did not abuse its discretion in vacating the medication order.

¶ 30        1. The Question of the State's Compliance with Section 3-609 was not Forfeited

¶ 31    As a threshold matter, the State argues that the trial court should have viewed as forfeited respondent's late citation to section 3-609.  The State cites *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005), for the proposition that an objection on a specific basis *may* result in the forfeiture of other, unnamed bases.  *Cuadrado* concerned two separate challenges to criminal jury instructions: the failure to define intent and the failure to mirror the language in the indictment. *Id*.  The defendant raised the former at trial, but he did not raise the latter until appeal, and, thus, the court found the latter to be forfeited.  *Id*.  Here, unlike in *Cuadrado*, we are not concerned with two separate errors, one raised and one forfeited.  We are concerned with one alleged error, the failure to timely notify the consulate and provide it with adequate documentation. Respondent raised this alleged error at trial.

¶ 32    It is true that respondent initially cited the Vienna Convention, rather than the Code, as authority for her position that the State must ensure that the Bulgarian consulate be notified. When respondent mentioned the Code orally, she did not specifically cite section 3-609, and she did not focus on the most relevant portion of section 3-609, which required that two persons designated by respondent receive copies of the admission petition and accompanying documentation; rather, she argued that the consulate was analogous to a guardian.  Nevertheless, at each and every court appearance, respondent raised the broad issue of notifying the consulate. While the court should not undertake the role of advocate, it is charged with knowledge of the law.  See, *e.g.*, *People v. Mischke*, 278 Ill. App. 3d 252, 264 (1995) ("the trial court is presumed to know the law, to apply it properly, and to consider only competent evidence.").  On the motion to reconsider, the court briefly lamented the rotation of judges in the mental-health court and a lack of specialization from the attorneys that results from a limitation of public resources. In this context, the court could have reasonably determined that basic knowledge of a respondent's right to designate two persons to be notified concerning the admission proceedings was so elementary that respondent should not pay the price for the limited background of the court and the attorneys in admission procedure.  Under these circumstances, where counsel zealously and repeatedly raised the broad issue, respondent did not forfeit the issue.

¶ 33    Additionally, the State argues that the trial court should have found respondent's claim forfeited because her failure to earlier cite section 3-609 led to a waste of judicial resources.  The State contends that, if it had known that it was obligated to provide the consulate with the admission petition, it would have done so and simply requested that the hearing be continued. We are unpersuaded.  The State should be aware of its own statutory obligations; like the court, it is charged with knowledge of the law.  In any case, before filing her motions to strike the

petitions, respondent repeatedly asked that the consulate be notified. The State finally did so, only after being told at the July 25, 2014, hearing that respondent was going to draw up her request in a written motion. After filing the motions to strike, respondent argued, *inter alia*, that the State's notice was substantively insufficient. The State did not offer, at the hearing on the motions to strike or in the two weeks between the hearing and the court's ruling on the motions, to send more complete documentation. Thus, the State's suggestion that it would have provided the consulate with more complete information if only it had known is, by and large, not well taken.

¶ 34                                   2. The Merits of the Motion to Reconsider

¶ 35     A motion to reconsider is meant to bring to the trial court's attention newly discovered evidence not previously available, changes in the law, or errors in the trial court's application of existing law. *Perkey v. Portes-Jarol*, 2013 IL App (2d) 120470, ¶ 103. The decision to grant or deny a motion to reconsider lies within the court's discretion, and we will reverse only if the court abused its discretion. *Id.* A court abuses its discretion only if it acts arbitrarily, fancifully, and without conscientious judgment; in view of all the circumstances, exceeds the bounds of reason (*State Farm Fire & Gas Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000)); issues an order with which no reasonable person would agree (*Maggi v. RAS Development, Inc.*, 2011 IL App (1st) 091955, ¶ 61); applies an incorrect legal standard (*Green v. Safeco Life Insurance Co.*, 312 Ill. App. 3d 577, 580 (2000)); *or* makes a decision based on an inadequate record (*Street v. Street*, 325 Ill. App. 3d 108, 114 (2001)). If reasonable persons can differ in their views of the

propriety of the court's actions, the court cannot be said to have abused its discretion. *Clay v. County of Cook*, 325 Ill. App. 3d 893, 901 (2001).[3]

¶ 36                     i. The State Violated Section 3-609

¶ 37      The State concedes that it violated section 3-609. At the close of oral argument, it noted that what happened was "clearly unfortunate" and that it "would do it correctly in the future." And, while it maintained that the violation was harmless, it urged the court to "provide some guidance by pointing out section 3-609," as there is "not much case law" on its provision requiring notification of "other designated parties." Indeed, we have found no case law concerning the provision. Thus, while the language of section 3-609 is clear, we review it herein.

¶ 38      The primary rule of statutory interpretation is to ascertain and effectuate the true intent of the legislature. *People ex rel. Hanrahan v. White*, 52 Ill. 2d 70, 73 (1972). In interpreting a statute, a court must give the language its plain and ordinary meaning. *Illinois Power Co. v. Mahin*, 72 Ill. 2d 189, 194 (1978). If the language of the statute is plain, clear, and unambiguous, the court should give effect to the language without resorting to other aids for construction. *In re Marriage of Logston*, 103 Ill. 2d 266, 277 (1984). Involuntary-admission

---

[3] We acknowledge that, where the motion to reconsider turns on a misapplication of law, our review can be *de novo*. *In re Marriage of Heinrich*, 2014 IL App (2d) 1211333, ¶ 55. Here, our review of the trial court's interpretation of section 3-609 will be *de novo*. However, as will be explained, because the law gives the trial court the *option* of vacating an order in the face of noncompliance with section 3-609, our review of the trial court's decision to vacate the orders will be for an abuse of discretion. The State concedes that our ultimate review of this case should be for an abuse of discretion.

proceedings invoke a respondent's liberty interest, and, thus, the Code must be strictly construed in the respondent's favor. *In re Martens*, 269 Ill. App. 3d 324, 327 (1995).

¶ 39    Again, section 3-609 states:

"Within 12 hours after his admission, the respondent shall be given a copy of the petition and a statement as provided in Section 3-206.  Not later than 24 hours, *** a copy of the petition and statement shall be given or sent to the respondent's attorney and guardian, if any.  The respondent shall be asked if he desires such documents sent to any *other* persons, *and at least 2 such persons designated by the respondent* shall receive such documents.  The respondent shall be allowed to complete no less than 2 telephone calls at the time of his admission to such persons as he chooses."  (Emphases added.) 405 ILCS 5/3-609 (West 2014).

We note that the language allowing for a respondent to designate "any other persons," while clear, is also quite broad.  We turn to *In re Robert S*., 213 Ill. 2d 30 (2004), for guidance on that point.

¶ 40    In *Robert S*., a provision concerning involuntary-medication proceedings mandated that notice be sent to a respondent's " 'attorney' " or " 'any known agent.' "  *Id*. at 56-57 (quoting 405 ILCS 5/2-107.1(a-5)(1) (West 2000)).  The respondent argued on appeal that the State violated the provision when it failed to send notice to the respondent's *criminal* defense attorney (as opposed to the attorney who had been representing him in the mental-health court).  The supreme court agreed that the State violated the provision.  *Id*.  It noted that the terms "attorney" and "any known agent" were broad, general, and stated without qualification.  *Id*. at 57.  The court determined that, given the absence of any restrictive language, the respondent's criminal counsel qualified, at a minimum, as a "known agent."  *Id*.

¶ 41 With the guidance of *Robert S.*, we allow the term "any other persons" to remain as broad as it sounds. However, we cannot allow the broadness of the term to open the door for a respondent to make unreasonable designations. A respondent's designation must meet an implicit reasonableness requirement.

¶ 42 In light of the early pleadings and the transcripts in this case, it seems that the State's reluctance to contact or involve the consulate was based, at least in part, on its feeling that respondent was making an unreasonable request. A request to contact and involve a diplomatic entity might initially come across as out-of-touch. However, in this case, it was not. Mental illness does not necessarily render a person incapable of making rational decisions. *In re Torski C.*, 395 Ill. App. 3d 1010, 1021 (2009). The State must remember to afford a respondent's requests, especially those endorsed by his or her attorney, serious consideration.

¶ 43 Here, the implicit reasonableness requirement was met. Respondent is a Bulgarian citizen (the State concedes this point). A Bulgarian consul is charged with aiding Bulgarian citizens living abroad. See, *e.g.*, Merriam-Webster Dictionary, http://www.merriam-webster.com/ dictionary/consul (last visited Dec. 4, 2015) (a consul is "a government official whose job is to live in a foreign country and protect and help the citizens of his or her own country who are traveling, living, or doing business there"). Additionally—and although we must be careful in making this point, because we are not acting as arbiters of the Vienna Convention and we are *not* saying that the Vienna Convention affords relief to individual respondents in mental-health proceedings—the fact that the plain language of the Vienna Convention calls for the notification of a foreign national's consulate when a foreign national is detained in "any *** manner" and requests such notification speaks to the reasonableness of respondent's request to notify her consulate. Vienna Convention on Consular Relations and

Optional Protocol on Disputes, art. 36(1)(b), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261. Not only was respondent's request reasonable within the context of a mental-health proceeding, but its satisfaction was also required by an international treaty. Thus, Respondent's request to provide her consulate with the petition detailing the reasons for her detainment was highly reasonable.

¶ 44   Accordingly, we agree with the trial court's determination that, pursuant to section 3-609, a respondent who is a foreign national may designate her locally stationed consul as one of her two "other persons" who must receive copies of the admission petition. To be clear, section 3-609 does *not* require providing a foreign consulate with the petition in every mental-health case. Rather, section 3-609 requires providing the foreign consulate with the petition *if* the respondent chooses the consulate as one of two or fewer designated persons. Also, this provision concerning "other" designated persons is separate from the preceding portion of section 3-609, which separately mandates that the respondent's attorney and guardian receive the petition.

¶ 45   Having discussed section 3-609's requirements, we turn to the question of the State's violation. Here, when respondent first asked to involve the consulate, she had not yet asked to designate any other person, aside from, possibly, her mother. The State refused, five times in open court, to notify or otherwise involve the consulate in any way. When the State notified the consulate on July 29, 2014, it did *not* include the admission petition. The petition included two certificates of examination. These certificates included details of respondent's medical condition. Thus, as the State now concedes, its actions in notifying the consulate were both untimely and deficient. The State plainly violated section 3-609.

¶ 46           ii. Case Law Authorizes a Court to Vacate an AdmissionOrder
                 Based on a Section 3-609 Violation, and the Trial Court
                    did not Abuse its Discretion in Doing so Here

¶ 47    Here, the trial court chose not to excuse the State's failure to strictly comply with section 3-609.    It either rejected or chose not to weigh heavily the State's argument that the noncompliance was harmless because, although its actions were untimely and deficient, the consulate did, eventually, receive notice.    As we will explain, the court's decision was both consistent with existing case law and reasonable.

¶ 48    Generally, the supreme court requires strict compliance with the Code.  *In re Lance H*., 2014 IL 114899, ¶ 20.    Under a strict-compliance approach, courts may reverse without even reaching the issue of prejudice.  *In re Barbara H*., 183 Ill. 2d 482, 498 (1998) (where statutes are all but ignored, the appellate court is correct to reverse the judgment); *In re Alaka W*., 379 Ill. App. 3d 251, 275 (2008); *In re Cynthia S*., 326 Ill. App. 3d 65, 69 (2001).    As this court has noted, the decision to reverse based on the State's failure to strictly comply with a statute is compelling because, in some cases, excusing the noncompliance due to a lack of resulting prejudice can emasculate provisions meant to safeguard a mental-health patient's liberty interests.  *Cynthia S*., 326 Ill. App. 3d at 69.

¶ 49    Nevertheless, a court may excuse a failure to strictly comply with the Code, in the sense that the court will not reverse, if the error was harmless or if the record demonstrates the satisfaction of legislative intent such that reversing due to the failure to strictly comply would amount to requiring the performance of an "empty formality."  *In re Lance H*., 2014 IL 114899, ¶ 20 (ultimately finding no Code violation); see *In re Nau*, 153 Ill. 2d 406, 419 (1992) (court is not required to reverse due to noncompliance with the Code's requirements, if the error is harmless).

¶ 50     We briefly review several cases where the appellate court chose to reverse an admission or a medication order based on the State's noncompliance with the Code: *Robert S.*, *In re Leslie H.*, 369 Ill. App. 3d 854 (2006), *Cynthia S.*, and *Martens*.

¶ 51     In *Robert S.*, as we have discussed, the State violated section 2-107.1(a-5)(1) of the Code (405 ILCS 5/2-107.1(a-5)(1) (West 2000)), which required the State to notify "any known agent" of the respondent in involuntary-medication proceedings.  *Robert S.*, 213 Ill. 2d at 56-57.  The State did not send notice to the respondent's criminal attorney, who was reasonably considered the respondent's "known agent."  *Id.*  The court determined that the noncompliance warranted reversal, albeit as a second basis for the reversal.  *Id.*  It did not perform a harmless-error analysis, opining only that there "*may* be consequences pertinent to the pending criminal matter." (Emphasis added.)  *Id.* at 57.

¶ 52     Similarly, in *Leslie H.*, the State violated section 2-107.1(a-5)(1) of the Code (405 ILCS 5/2-107.1(a-5)(1) (West 2004)) when it did not send notice to the respondent's criminal attorney, who was the respondent's "known agent."  *Leslie H.*, 369 Ill. App. 3d at 856-57.  This court determined that the noncompliance warranted reversal.  *Id.* at 858.  We did not perform an extensive harmless-error analysis, instead explaining only that the notice requirement was not "an empty formality," because "the result of a petition to involuntarily administer psychotropic medication *may* affect a respondent's pending criminal case."  (Emphasis added.)  *Id.* at 857.  Thus, as in *Robert S.*, in deciding to reverse, we considered *possible* prejudice to be incurred in *collateral* proceedings.

¶ 53     In *Cynthia H.*, the trial court violated section 2-107.1(a)(6) of the Code (405 ILCS 5/2-107.1(a)(6) (West 2000)), which required the medication order to designate the persons authorized to administer the medication.  *Cynthia H.*, 326 Ill. App. 3d at 68-69.  The trial court's

order failed to specifically name the authorized health professionals. *Id*. This court determined that the trial court's noncompliance warranted reversal. *Id*. We noted that the provision at issue was critical, because it insured that only a limited and specific number of qualified persons familiar with the respondent's case would administer the medication to the respondent. *Id*. at 69. Without naming the designated providers, "virtually anyone with the proper license" could administer the medication, regardless of their prior involvement with or knowledge of the respondent's case. *Id*. We declined to perform a harmless-error analysis, stating only that, if we were to conclude that there was "no resulting prejudice, we would essentially emasculate the portion of the statute in contention." *Id*.

¶ 54    Finally, in *Martens*, the State violated the provision of section 3-609 that required that notice (and a copy of the admission petition) be sent to the guardian. *Martens*, 269 Ill. App. 3d at 328. This court reversed due to the noncompliance, noting that the error was "not harmless," because some of the factors the trial court relied upon to find the respondent subject to admission related to the guardian's duties. *Id*.

¶ 55    No published case yet discusses a violation of the provision concerning a respondent's right to designate "other persons" to whom the State shall ensure receipt of the admission petition. Still, this provision sets forth a statutory requirement with obvious value to a given respondent. This provision protects the rights of a respondent in that it gives him or her a greater voice in the proceedings and allows him or her to reach out to potential advocates. This provision is not purely ministerial and is no less important than contacting an attorney in a collateral proceeding or specifying by name the licensed professionals who may dispense a respondent's medication. Drawing from *Robert S*., *Leslie H*., *Cynthia H*., and *Martens*, where an appellate court reversed or vacated the admission or medication order due to the State's or the

trial court's noncompliance with the Code, we determine that the trial court here was clearly authorized to vacate the admission order due to the State's noncompliance with section 3-609.

¶ 56    We reject the trial court's initial position that *Najera* and *Montano* in any way precluded the court from vacating the admission order. Those criminal cases held that violations of the *Vienna Convention* did not provide a basis for individual relief in the form of reversing the convictions or dismissing the charges. *Najera*, 371 Ill. App. 3d 1144 (2007); *Montano*, 365 Ill. App. 3d 195 (2006). Here, in contrast, *section 3-609* gives a mental-health respondent express protection wherein he or she may designate a person to receive certain documentation and, potentially, participate in the proceedings and/or treatment decisions. Unlike a violation of the Vienna Convention, the State's violation of the Code provides a basis for a respondent's individual relief. There is no analogous statute in criminal law.

¶ 57    We also reject any concern that affording relief under the Code for a failure to honor the specific request of notifying one's consulate would effectively give mental-health respondents "greater" liberty interests than those of criminal defendants. We appreciate the point that each individual is born with liberty interests that are no greater than those of any other individual. However, there is not just one type of liberty interest. Different types of proceedings implicate different liberty interests to different degrees. The supreme court has called the liberty interests at stake in mental-health proceedings "massive." (Internal quotation marks omitted.) *Robert S.*, 213 Ill. 2d at 46. Mental-health proceedings and criminal proceedings each implicate the obvious liberty interests against physical detainment. However, mental-health proceedings implicate certain liberty interests that, typically, are not threatened during criminal proceedings, such as the interest against unwarranted intrusions into one's body and mind. See, *e.g.*, *In re Joseph M.*, 398 Ill. App. 3d 1086, 1090 (2010). The involuntary administration of psychotropic

medication constitutes a "particularly severe" interference with a respondent's liberty, because, often, the effects cannot be undone and the respondent is permanently altered. (Internal quotation marks omitted.) *Robert S.*, 213 Ill. 2d at 49. Additionally, the relative difficulty or ease with which a given liberty interest can be taken away is different in mental-health proceedings than in criminal proceedings. In mental-health proceedings, the State must prove its case by clear and convincing evidence, as opposed to beyond a reasonable doubt. *In re Stephenson*, 67 Ill. 2d 544, 556-57 (1977). Also, a mental-health respondent can lose his or her liberty based on what he or she might be reasonably expected to do, rather than what she has been proven to have done. *Torski C.*, 395 Ill. App. 3d at 1024. Given the particular vulnerabilities of mental-health respondents, it does not surprise us that the legislature has afforded mental health respondents certain statutory protections not afforded to persons in other types of legal proceedings.

¶ 58 Having established that the trial court was authorized to take a strict-compliance approach and vacate the admission order in light of the State's noncompliance with section 3-609, we now consider whether it abused its discretion in doing so. We determine that it did not.

¶ 59 Here, as in *Cynthia S.*, the trial court chose not to excuse the State's failure to strictly comply with the Code. However, even more compelling than in *Cynthia S.*, or *any* case cited by the parties, this case does not involve a mere oversight by the State. Rather, in this case, respondent repeatedly asked the State to notify the consulate. Initially, the State flatly refused to do so. Then, it attempted to place its burden to notify on respondent's attorney. Several weeks later, it notified the consulate, but it did not include the admission petition. When respondent argued that the notice was not only untimely but substantively insufficient, the State did not offer to provide further documentation to the consulate. We understand that respondent did not

initially cite the proper authority. Still, the State is charged with knowledge of the law, and, where respondent repeatedly requested notification of the consulate, the State's failure to do so cannot be characterized as an oversight. The State acknowledges on appeal that its actions were "clearly unfortunate," and it promises that it will act differently in the future. However, given the State's initial refusal to notify the consulate and its most recent position at trial, standing on its arguments on the motions to strike (where it argued that respondent's attorney could have notified the consulate), it is unclear whether anything short of vacating the admission order would have drawn the State's *mea culpa* and promise to act differently in the future.

¶ 60    To whatever extent the trial court considered the State's rebuttal that respondent was not prejudiced because the consulate was eventually notified, the court was not required to find that argument controlling or satisfactory. As to whether the court was required to find the State's prejudice argument *controlling*, the court may reasonably have found that, regardless of prejudice, it could not excuse the State's noncompliance. Again, as we have already stressed, the State refused five times in open court to notify the consulate, even though, upon respondent's request, this was required by section 3-609. Moreover, while not bases for reversal, the State further eroded its goodwill with the court by its actors' failure to timely secure Bulgarian translators and by its decision to ignore clear language in the Vienna Convention. The court expressly noted its disapproval that a Bulgarian translator had not been used to inform respondent of her rights prior to the admission evaluation. Additionally, the court expressly noted its disapproval of the State's handling of respondent's request under the Vienna Convention. In numerous hearings, the State appeared to refuse respondent's requests under the Vienna Convention exactly because it knew that respondent had no course thereunder for individual relief. The court rather unambiguously stated that it felt that the State, among others,

mishandled the case. Thus, faced with an overt continuing Code violation, the court may reasonably have found the State's noncompliance to be inexcusable, regardless of prejudice.

¶ 61 As to whether the trial court was required to find the State's prejudice argument *satisfactory*, the court may reasonably have found that the State failed to allay a number of valid concerns. Prejudice should not be measured only by the fact that, in the State's view, an admission was inevitable. See, *e.g.*, *Robert S.*, 213 Ill. 2d at 56-57 (reasoning that the State's noncompliance *could* prejudice the respondent in a *collateral* proceeding); *Leslie H.*, 369 Ill. App. 3d at 858. Rather, the integrity of the proceedings, respondent's experiences during the month between the filing of the admission petition and the hearing on the merits of the petition, and the medication order that ultimately followed (albeit in separate proceedings) are also considerations. Here, the consulate never received the petition. During the delay caused by the State's noncompliance, respondent repeatedly, and with distress, inquired as to the status of her "papers" and of her young daughter, two questions the consulate might have been able to address. Respondent had been detained a *full year* following a misdemeanor charge before the medication petition was filed, on June 23, 2014. Then, the State sought to put her on seven powerful medications, with eight alternatives should any of those not work. The State and its actors did not obtain the Bulgarian medical records so as to avoid this risky trial-and-error process. In short, there were a number of troubling aspects to this case that the State chose not to address. It would be difficult to find that the record affirmatively demonstrated that the purpose of the statute had been achieved with so many troubling aspects of the case left unaddressed. The State's failure to allay the trial court's concerns was underscored by the extraordinarily weak manner in which it argued "no prejudice," choosing to stand without elaboration on its argument from the prior hearing, which argument had been made in the context of an erroneous finding

that there was no Code violation. Thus, the court may reasonably have found the State's "no prejudice" argument to be unsatisfactory.

¶ 62    Under the circumstances of this case, it simply cannot be said that no reasonable person would agree with the trial court's decision not to excuse the State's failure to strictly comply with section 3-609. The trial court did not abuse its discretion in vacating the admission order.

¶ 63    Our above rationale is dispositive. However, we do take some time to distinguish a cluster of cases cited by the State in which reviewing courts declined to reverse admission orders based on the State's noncompliance with various portions of the Code, because the records affirmatively established that the respondents were not prejudiced. See, *e.g.*, *Nau*, 153 Ill. 2d at 419 (although there was no certification that the respondent received formal notice of the hearing, pursuant to section 3-611 (Ill. Rev. Stat. 1989, ch. 91½, ¶ 3-611), the respondent *did not object* in the trial court to the lack of notice, and it was clear that he received actual notice, because he appeared at the hearing and his counsel was well-prepared to represent him); *In re Kevin S.*, 381 Ill. App. 3d 260, 265 (2008) (although there was no certification that, pursuant to section 3-609, the respondent received notice of his rights within 12 hours of the filing of the petition, the respondent *did not object* in the trial court, and the respondent was not prejudiced because it was clear that he and his attorney came well prepared to the hearing); *In re Todd K.*, 371 Ill. App. 3d 539, 541 (2007) (although the respondent's guardian was not formally served pursuant to section 3-609, respondent *did not object* in the trial court, and the safeguards intended by section 3-609 were met where the guardian received a copy of the admission petition and was contacted about the medication plan).

¶ 64    The cases cited by the State are inapposite, because each involved a plain-error review by the reviewing court. In each of the State's cases, the respondent *did not object* in the trial court

to the noncompliance. Thus, the courts performed a review analogous to a plain-error review, even where they used the word "harmless." See, *e.g.*, *Martens*, 269 Ill. App. 3d at 327 (even if not raised at trial, noncompliance with the Code may be considered on appeal under a doctrine analogous to plain error). This is important because the burden of persuasion in a plain-error review is different from that in a harmless-error review. Under a plain-error review, the wronged party bears the burden of persuasion to show that the error was prejudicial (assuming that the court determines that prejudice should be a dispositive issue), whereas under a harmless-error review the noncomplying party—here, the State—bears the burden of persuasion to show the absence of prejudice (again assuming that the court determines that prejudice should be a dispositive issue). *People v. Herron*, 215 Ill. 2d 167, 181 (2005).

¶ 65    A plain-error analysis *simply does not apply* to the instant case. Here, as we have discussed, respondent repeatedly objected to the State's failure to timely and adequately notify the consulate. Thus, the *trial* court, not a reviewing court on plain-error review, looked at the State's failure to strictly comply with the Code and decided that, due to either the importance of the provision at issue (*i.e.*, not an empty formality), the State's overt and repeated noncompliance, the State's failure to allay concerns of prejudice, or some combination thereof, it would not excuse the State's failure to strictly comply with the Code. The trial court did not abuse its discretion in so deciding.

¶ 66    The dissent believes that the trial court's decision to vacate the admission order due to the State's failure to strictly comply with section 3-609 amounts to requiring the satisfaction of an empty formality, and thus the dissent favors a substantial-compliance approach. The dissent relies, in part, on In *Lance H.*, but, in our view, *Lance H.* does not support the dissent's position. In *Lance H.*, the supreme court did not depart from the general rule of strict compliance. *Lance*

*H.*, 2014 IL 114899, ¶¶ 29-35. Rather, the *Lance H.* majority decided not to reverse the admission order, because it found no Code violation, a circumstance inapposite to the instant case. *Id.* The debate among the members of the *Lance H.* court was *not* whether there was a Code violation and, if so, whether to excuse it. Rather, the debate was whether, even absent a Code violation, the trial court should have gone *above* the requirements of the Code to protect the respondent's liberty interests where it could have easily done so. *Id.* ¶¶ 54-55 (Burke, J., dissenting). Here, the dissent's arguments are sound if one views compliance with section 3-609 as an empty formality and thus takes a substantial-compliance approach. However, for the reasons stated above, we disagree that any of section 3-609's component requirements are empty formalities and we believe that the State failed altogether to comply with the "other persons" requirement. As a result, we do not believe that the trial court abused its discretion in following the general rule set forth by the supreme court to take a strict-compliance approach and to decline to excuse the State's noncompliance.

¶ 67                    C. Motion to Reconsider Medication Order

¶ 68    The State argues that, even if the trial court was justified in vacating the admission order, it abused its discretion in vacating the medication order. In support of its argument, the State notes that section 3-609 pertains only to the notice required in admission proceedings. Section 2-107.1 pertains to the notice required in medication proceedings, and that section names only the respondent, the attorney, and the agent or guardian; it does not grant the respondent the right to designate two other persons to receive the petition and documentation. 405 ILCS 5/2-107.1(a-5)(1) (West 2014) ("The petitioner shall deliver a copy of the petition, and notice of the time and place of the hearing, to the respondent, his or her attorney, any known agent or attorney-in-fact, if any, and the guardian, if any, no later than 3 days prior to the date of the hearing.").

¶ 69    The State forfeited this issue by failing to raise it in the trial court. *People v. Jackson*, 199 Ill. 2d 286, 308 (2002).  In any case, the State's argument is not compelling.  Upon a cursory review, we are not convinced of the State's premise that only the admission statute, as opposed to the medication statute, allows a respondent to designate a person to receive the petition and documentation.  If, as here, "a hearing is requested to be held immediately following the hearing on a petition for involuntary admission, then the notice requirement *shall be the same* as that for the hearing on the petition for involuntary admission, and the petition filed pursuant to this Section shall be filed with the petition for involuntary admission."  (Emphasis added.)  405 ILCS 5/2-107.1(a-5)(1) (West 2014).  Also, the medication statute *does* require notification of an individual designated by the respondent, if the designation was made in writing.  405 ILCS 5/2-102(a) (West 2014).  The designated individual may participate in the formulation of the treatment plan and review the treatment plan.  *Id*.

¶ 70    Moreover, the State effectively concedes that the medication order here could not stand alone, by suggesting that the trial court should have left the order in effect and that "those authorized to administer the medication could simply have requested a modification of the order to an appropriate outpatient facility."  The treatment plan was devised in the context of inpatient treatment and, absent modification, could be implemented only in the context of inpatient treatment.  Thus, the trial court's determination that the medication order stemmed from the admission order is sound, and the State forfeited its opportunity to request a modification as opposed to a reversal.

¶ 71    We acknowledge that respondent likely needs treatment, but this alone does not persuade us to make an exception to the rule of forfeiture.  If the State believes that respondent remains in need of involuntary admission and should be involuntarily administered psychotropic

medication, it must initiate new proceedings in the trial court. See, *e.g.*, *Barbara H.*, 183 Ill. 2d at 498 (holding that outright reversal, rather than remand, was appropriate in light of Code violations).

¶ 72 Because we are affirming the vacation of the admission and medication orders, we will not address the State's arguments concerning the trial court's criticism that respondent was not informed of her rights in her primary language prior to her initial evaluation for admission. The trial court clarified that it did not base its decision to vacate on this possible error. Rather, it based its decision to vacate on the violation of section 3-609, and we affirm on that basis.

¶ 73                                III. CONCLUSION

¶ 74 For the aforementioned reasons, we affirm the trial court's judgment.

¶ 75 Affirmed.

¶ 76 JUSTICE SPENCE, dissenting.

¶ 77 I respectfully dissent. Although I agree with the majority that the public-interest exception to the mootness doctrine applies (*supra* ¶ 22), I believe that the trial court abused its discretion in granting respondent's motion to reconsider. In my opinion, the State's failure to strictly comply with section 3-609 of the Code (405 ILCS 5/3-609 (West 2014)) was harmless error because the State substantially complied with the statute and respondent was not prejudiced.

¶ 78 The trial court granted respondent's motion to reconsider based on the State's failure to notify the Bulgarian consulate according to the requirements of section 3-609, which provides:

    "Within 12 hours after his admission, the respondent shall be given a copy of the petition and a statement as provided in Section 3-206. Not later than 24 hours, *** a copy of the petition and statement shall be given or sent to the respondent's attorney and

guardian, if any. The respondent shall be asked if he desires such documents sent to any other persons, *and at least 2 such persons designated by the respondent* shall receive such documents. The respondent shall be allowed to complete no less than 2 telephone calls at the time of his admission to such persons as he chooses." (Emphasis added.) *Id.*

¶ 79 The majority is correct that, in involuntary-admission proceedings, strict compliance with statutory procedures is generally required since such proceedings affect important liberty interests. *In re Louis S.*, 361 Ill. App. 3d 763, 768 (2005); *supra* ¶ 48. Still, even though substantial liberty interests are implicated, these interests must be balanced against the dual objectives of involuntary admissions: to provide care for those who are unable to care for themselves and to protect society from the dangerously mentally ill. *In re Kevin S.*, 381 Ill. App. 3d 260, 264 (2008).

¶ 80 The State admits that it failed to strictly comply with section 3-609, but it contends that the error was harmless. Because respondent objected to the lack of notice to the Bulgarian consulate, I agree that the burden is on the State to show that respondent was not prejudiced. See *People v. Herron*, 215 Ill. 2d 167, 181-82 (2005) (in a harmless-error analysis, which applies when a defendant has made a timely objection, it is the State, not the defendant, that bears the burden of persuasion with respect to prejudice).

¶ 81 Under section 3-609, the State was required to notify the Bulgarian consulate once respondent designated it as a "person" to receive notice. The State was also required, under section 3-609, to include the admission petition in the notification. As the State concedes, it delayed notifying the Bulgarian consulate and, when it did so, it failed to include the petition. The State ultimately notified the Bulgarian consulate on July 29, 2014, which was two weeks after it filed the petition, on July 14, 2014. Though the notification was untimely and lacked the

petition, I nevertheless believe that the notification was sufficient to achieve the purposes of the statute. See *In re Robinson*, 151 Ill. 2d 126, 131 (1992) (under certain circumstances, the State's failure to strictly comply with provisions of the Code may be excused if the record establishes that the purposes of the statute have been achieved). Specifically, the consulate was notified that respondent was being detained; it was notified of the mental-health statute under which she was being detained; it was notified of the date of the upcoming hearing; and the consulate confirmed receipt of this information. The purposes of the statute were satisfied in that respondent identified the "person" she wanted notified, notification occurred, and it occurred in time for the consulate to take action regarding the hearing. I also note that the remainder of section 3-609 was complied with, in that respondent's attorney was timely notified of the petition and thus able to represent respondent throughout the proceedings. Accordingly, the State has met its burden of showing that respondent was not prejudiced and that the error was harmless. See *In re Nau*, 153 Ill. 2d 406, 419 (1992) (any error was harmless since the legislative intent of the statutory provision was achieved, and the court would not insist on the performance of an empty formality).

¶ 82    Given the State's substantial compliance with the statute, I disagree with the majority's position that the State "failed altogether to comply with the 'other persons' requirement." *Supra* ¶ 66. For this reason, I also disagree with the majority's position that prejudice may be presumed in this case. Rather than apply a harmless-error analysis based on the State's substantial compliance, the majority presumes prejudice based on the State's failure to strictly comply with the "other persons" notice requirement. See s*upra* ¶ 48. However, the cases relied on by the majority are distinguishable in that either they involved actual prejudice or prejudice

was presumed because the State failed altogether to comply with a requirement that was not an empty formality.

¶ 83    The first case, *In re Martens*, 269 Ill. App. 3d 324 (1995), involved actual prejudice to the respondent.  In that case, "there was a complete lack of notice" of the admission hearing to the respondent's guardians, "instead of a mere defect in the notice." *Id*. at 328.  In addition, the error was not harmless, because some of the factors relied upon by the trial court to find the respondent subject to involuntary admission related to the guardians' statutory duties. *Id*.  The case at bar is very different from *In re Martens*, where no notice was given to the guardians and the respondent was clearly prejudiced by their absence.

¶ 84    In the other cases cited by the majority, the requirement was more than an empty formality and the State completely failed to comply with it.  For example, in *In re Leslie H.*, 369 Ill. App. 3d 854, 855 (2006), this court determined that the failure to notify the respondent's criminal defense attorney of the petition to involuntarily administer psychotropic medication was reversible error given the possible impact on her pending criminal case.  This court noted that such notice was *not* an empty formality in that it could affect the respondent's fitness to stand trial in the criminal case. *Id*. at 857; see *In re Robert S.*, 213 Ill. 2d 30, 57 (2004) (same).

¶ 85    In *In re Cynthia S.*, 326 Ill. App. 3d 65 (2001), this court reversed the order authorizing involuntary administration of psychotropic medication, because it was unduly vague:  it authorized virtually anyone with the proper license to administer the medication, regardless of that person's prior involvement with or knowledge of the respondent's case. *Id*. at 69.  This court stated that requiring the order to specifically list the names of the individuals authorized to administer the medication ensured involvement by qualified professionals familiar with the respondent's individual situation and health status. *Id*. at 68-69.  We stated that, to conclude

otherwise and find no resulting prejudice would have emasculated the portion of the statute at issue. *Id*. at 69.

¶ 86    According to the majority, the notice requirement at issue here is not purely ministerial and is no less important than contacting an attorney in a collateral proceeding or specifying by name the licensed professionals who may dispense a respondent's medication. *Supra* ¶ 55. Thus, anything short of strict compliance with the requirement means that prejudice should be presumed. I disagree. In my opinion, the notice requirement in this case is not nearly as important as those requirements, where the possibility of prejudice is evident. The notice requirement at issue here is only for "other persons" designated by the respondent; it is not for an attorney or a guardian or an individual with a clear role or stake in the proceeding.

¶ 87    But that said, even assuming that the requirement in this case is not purely ministerial or an empty formality, which I believe it is, it was substantially complied with, and the legislative purposes of the statute were achieved, which means that prejudice should not be presumed. See *In re Lance H.*, 2014 IL 114899, ¶ 20 (noting that the supreme court has not required strict compliance with the Code in all instances and that it will not construe a statute as requiring the performance of an empty formality when the legislative intent has been otherwise achieved).[4] In other words, this is not a case where the State wholly failed to comply with the statute, as the majority asserts. As a result, the case at bar differs from *In re Martens*, *In re Leslie H.*, and *In re Cynthia S.*, where the legislative intent was not achieved because there was a *total* lack of compliance with specific requirements that were deemed *more* than empty formalities. See *In re Martens*, 269 Ill. App. 3d at 328 (no notice to guardians); *In re Leslie H.*, 369 Ill. App. 3d at 855

---

[4] The majority's attempt to distinguish *In re Lance H.* overlooks the fact that I cite it for a basic proposition of law.

(no notice to criminal attorney); *In re Cynthia S.*, 326 Ill. App. 3d at 68-69 (no designation of licensed professionals to dispense medication). This is especially true where the remainder and, I submit, the most important part of the statute here was complied with: respondent was at all times represented by able counsel who was timely notified of her detainment.

¶ 88    Given the State's substantial compliance with the "other persons" notice requirement, and the fact that the purposes of the statute were satisfied, the error was harmless in this case and vacating the orders was not required. See *In re Nau*, 153 Ill. 2d at 419 (the error was harmless where the legislative intent was achieved, and the court would not insist on the performance of an empty formality); see also *In re Kevin S.*, 381 Ill. App. 3d at 264 (while strict compliance with statutory procedures in involuntary-admission proceedings is required, a reversal is not required unless the respondent "is in some way prejudiced" by the failure to comply with those statutory requirements); see also *In re Todd K.*, 371 Ill. App. 3d 539, 541 (2007) (same).

¶ 89    The majority improperly rejects the above cases based on the type of review. According to the majority, *In re Nau*, *In re Kevin S.*, and *In re Todd K.* are inapposite because they involved plain-error review, as opposed to harmless-error review, in that the respondents in those cases failed to object. *Supra* ¶ 63. While it is true that there is a difference between these two types of review, in that here it is the State, not respondent, that bears the burden of persuasion with respect to prejudice (see *Herron*, 215 Ill. 2d at 181-82 (differentiating plain-error review from harmless-error review)), the type of review does nothing to alter the conclusion that the State satisfied its burden in this case. The State showed that the error was harmless because the consulate was notified of respondent's detainment prior to the hearing; thus, respondent was not prejudiced.

¶ 90    As a final matter, the majority accuses the State of "an overt continuing Code violation" (*supra* ¶ 60), given its refusal, five times in open court, to notify the consulate.  However, the State's failure to comply with the statute is partly explained by respondent's failure to request notification of the Bulgarian consulate under the appropriate section of the Code.  Respondent's requests that the State notify the Bulgarian consulate were premised on either the Vienna Convention, which she later rejected, or an unspecified part of the Code requiring notification of a guardian.  It is undisputed that respondent did not make her request to notify the Bulgarian consulate under section 3-609 of the Code until the time of her motion for reconsideration.  In fact, it is possible that the trial court could have declined to consider respondent's claim of error under section 3-609, given her failure to raise it sooner.  See *Kopley Group V., L.P. v. Sheridan Edgewater Properties, Ltd.*, 376 Ill. App. 3d 1006, 1022 (2007) (where new issues are raised for the first time in a motion to reconsider, and where there is a reasonable explanation for why the additional issues were not raised at the original hearing, the trial court has the discretion to address them).  In any event, while I agree that the trial court properly considered respondent's claim under section 3-609, given that she had requested notification of the consulate multiple times, albeit under different bases, the State's lack of compliance was not as flagrant as the majority asserts.  More important, the consulate actually received notice prior to respondent's hearing, thus giving the consulate an opportunity to act.

¶ 91    For these reasons, I would reverse the trial court's order granting the motion to reconsider, which had the effect of vacating the trial court's orders granting the petitions for respondent's involuntary admission and the involuntary administration of psychotropic medication.